UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                                      ) | CRIMINAL NO. 03-10370-DPW |
| ) | |
| GARY NEWELL,                    ) | |
| Defendant             ) | |
| ) | |

DEFENDANT GARY NEWELL'S MEMORANDUM
IN SUPPORT OF HIS MOTION TO SUPPRESS EVIDENCE

STATEMENT OF RELEVANT FACTS[1]

On January 24, 2003 at approximately 10:00 A.M., the defendant Gary Newell was using the self-serve equipment at a car wash located on Route 28 in Cambridge, Massachusetts to clean off his 1998 Ford pickup truck. The defendant's truck had valid Oregon plates and a hard "cap" with windows over its bed.

A few minutes later, the defendant drove out of the car wash, taking a right hand turn northbound onto Route 28. Contrary to investigating officer Cambridge Police Detective Stephen Edwards' report, the defendant did not go through a red traffic signal without coming to a stop.

The defendant continued northbound on Route 28 a short distance, veered to the right at the point at which Route 28 splits off to the left, and then took the first left exit. Shortly after taking the exit, the defendant was pulled over by two Cambridge police officers

---

[1] The relevant facts are based on information provided by the Government and other information contained in the Affidavits of Gary Newell and Debra A. DelVecchio.

in a marked cruiser using their lights and siren, reportedly at Detective Stephen Edwards' direction.

At gun point, the uniformed officers ordered the defendant out of his truck and directed him to its rear passenger side. They demanded his license and registration, which he produced. These documents confirmed the defendant's identity as a licensed Oregon driver, his ownership of the truck, and its proper registration.

The officers did not issue the defendant a traffic citation nor inform him that he was being stopped for an alleged red light violation. Instead, they told him that his truck matched the description of a vehicle involved in a bank robbery and that he was being detained so that a witness could come and view it.

These uniformed officers were joined by Detective Edwards who was in plain clothes. Detective Edwards reiterated the other officers' story that the defendant truck matched a vehicle involved bank robbery and that a witness was on the way.

Detective Edwards began looking through the truck's cap windows at the items inside. These items included ski gear, a tool box, a duffle bag, a sleeping bag, and a large white plastic bag containing two Federal Express boxes. One of the uniformed officers remained with the defendant.

After a few minutes, Detective Edwards returned to the defendant and the officer. The detective began questioning the defendant concerning his presence in Massachusetts, his hotel accommodations,

and the contents of his truck. The defendant answered Detective Edwards' questions.

Detective Edwards left the defendant standing with the uniformed Cambridge officer on several more occasions while the detective peered into the back of the truck. Several other law enforcement agents had arrived and were standing by in the area as well. Ultimately, Detective Edwards told the defendant that no robbery witness was en route to the scene. However, he continued to express interest in the defendant's truck.

Detective Edwards informed Mr. Newell that the defendant was acting nervously and that the detective suspected there might be contraband in the truck. Detective Edwards specifically referred to the two Federal Express boxes that were in the back of the truck ("the packages") and asked the defendant if he could look inside them. The defendant said, "No."

Detective Edwards continued to ask the defendant questions while the Cambridge Police officer stood at his side. The detective indicated that he wanted to have the defendant's truck checked by a narcotics detection dog. He then asked the defendant again about the contents of the packages and whether he could look inside them. The defendant again denied the detective's request to inspect the packages.

More than an hour later, Massachusetts State Trooper Mark Reid arrived with a dog named Mako who purportedly was trained in narcotics

detection. Trooper Reid led Mako slowly around the outside and inside of the defendant's truck, including the passenger compartment and rear bed. Mako did not react to anything inside or outside the truck.

Trooper Reid and Detective Edwards, along with some other officers, then had a conversation a short distance from the defendant's truck. Within minutes, Trooper Reid returned to the truck, moved the packages forward, and directed Mako toward them. This time, Mako reportedly scratched and bit the packages, tearing a hole in one of them. The officers looked inside this package and found currency.

Afterward, Detective Edwards approached the defendant, who was still flanked by the uniformed officer, and asked him about the contents of the packages. The defendant did not respond. Detective Edwards then advised the defendant that the police were seizing his truck and its contents, and would be seeking a search warrant. The detective asked the defendant for a contact telephone number which the defendant supplied.

Detective Edwards then advised Mr. Newell for the first time that he was free to go and the defendant promptly left the area. It was now approximately 12:30 P.M., two and one-half hours after the defendant was pulled over. Mr. Newell was never cited for a red light violation, told that this alleged moving violation was the reason for the traffic stop, or advised of his Miranda rights on January 24, 2003.

-4-

The defendant's truck reportedly was towed to a DEA garage while Detective Edwards applied for a warrant to search it. In his search warrant application, the detective recounted information that he gleaned from his conversations with the defendant during the traffic stop, the search of his truck, and Mako's behavior at the scene. The affidavit purports to detail Mako's training and experience as a narcotics detector dog, as reported by Trooper Reid. It does not indicate Mako's "false alert" rate. It also does not mention that the officers drew their weapons when they stopped the defendant or anything about a bank robbery investigation.

The search warrant was approved by the Cambridge District Court and executed that same day. It authorized the police to search for "Controlled Substances as defined in [M.G.L.] C94c (sic), U.S. currency, and/or any other proceeds related to the distribution of controlled substances" as well as the two packages. No narcotic substances were found in the truck or any of the items inside it. The police did not request authority to search for weapons when they applied for the search warrant and none were found when it was executed.

The defendant was not charged with any crime until he was indicted on marijuana conspiracy charges on December 4, 2003, nearly a year after his traffic stop. Defense counsel was appointed on March 15, 2004. On April 6, 2004, defense counsel requested that the Government preserve all of the evidence in the case. (Exhibit A.)

She later requested, *inter alia*, Mako and his handler Trooper Reid's training and performance records in drug and currency detection. In a letter dated August 16, 2004, the Government advised defense counsel that virtually all of Mako's training and performance records had been "destroyed" by Trooper Reid sometime after the dog was retired from service "in about April of this year." (Exhibit B).

The only records produced by the Government relating Mako's training or performance are three certificates indicating that Mako was trained in narcotics detection in 1996, 1998, and 2000. Upon information and belief, Mako was never trained in currency detection. To date, the Government has declined to disclose any records relating to Trooper Reid's training and performance as a dog handler involved in contraband detection.

ARGUMENT

I. The Defendant Has Standing to Challenge the Initial Stop of His Motor Vehicle.

The threshold inquiry in reviewing the validity of a search or seizure is whether the defendant's own Fourth Amendment rights have been violated. United States v. Padilla, 508 U.S. 77, 81-82 (1993). The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of arrest. United States v. Brignoni-Ponce, 422 U.S. 837, 878 (1975). For this reason, it is beyond dispute that a vehicle's driver may challenge his traffic stop. United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989).

-6-

Therefore, the defendant in the case at bar has standing to challenge his traffic stop, subsequent detention, and the search and seizure of his truck.

> II. The Defendant's Seizure by the Police Violated His Fourth Amendment Rights.

The Fourth Amendment protects all persons from unreasonable searches and seizures. U.S. Cont. Amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." Whren v. United States, 517 U.S. 806, 809-810 (1996). See also, United States v. Woodrum, 202 F.3d 1 (1st Cir. 2000); United States v. Kimball, 25 F.3d 1, 5 (1st Cir. 1994).

Automobile stops are analogous to investigative detentions analyzed under the principals of Terry v. Ohio, 392 U.S. 1 (1968); Berkemer v. McCarty, 468 U.S. 420, 437-438 (1984). "Terry was intended to carve out an exception to the probable cause requirement only for relatively brief, non-arrest detentions; plainly, a seizure that is, de facto, tantamount to an arrest cannot fit within that exception." United States v. Acosta-Colon, 157 F.3d 9, 15 (1st Cir. 1998). An automobile stop is subject to the constitutional imperative that it not be unreasonable under the circumstances. Whren v. United States, 517 U.S. 806, 810 (1996). "A warrantless seizure supported by less than probable cause necessarily falls below the applicable

threshold of reasonableness if the seizure was the functional equivalent of an arrest." Acosta-Colon at 14.

In evaluating "reasonableness," a court must first determine, "'whether the officer['s] actions were justified at [their] inception,' and if so, 'whether the actions undertaken by the officer[s] following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officer[s] during the stop.'" United States v. Trueber, 238 F.3d 79 (1st Cir. 2001), quoting United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998). See also, Terry, 392 U.S. at 20. The scope of the intrusion permitted will vary with the particular facts and circumstances of each case. It is clear, however, that: "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Florida v. Royer, 460 U.S. 491, 500 (1983). It is the government's burden "to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." Id.

Police may validly stop a vehicle if they have probable cause to believe that a traffic offense has occurred, even if the offense is minor and the stop is merely a pretext to investigate other crimes. See, Arkansas v. Sullivan, 532 U.S. 769, 772 (2001); Wren v. United States, 517 U.S. 806, 810, 813 (1996); United States v. Andrade, 94

F.3d 9, 10-11 (1st Cir. 1996). The officers' subjective motivation is deemed irrelevant for Fourth Amendment purposes so long as their conduct does not exceed what they are objectively authorized to do. Id. Courts have warned against the police abusing their authority to engage in pretext stops. See, United States v. Freeman, 209 F.3d 464, 467-72 (6th Cir. 2000)(Clay, Circuit Judge, concurring). In the absence of a traffic violation or some other reasonable suspicion of criminal activity, the detention of a motorist violates the Fourth Amendment. United States v. Lopez-Soto, 205 F.3d 1101, 1106 (9th Cir. 2000); United States v. Lopez-Valdez, 178 F.3d 282, 287-289 (5th Cir. 1999); United States v. Hunguenin, 154 F.3d 547, 558 (6th Cir. 1998).

In the present case, Mr. Newell was stopped by two Cambridge police officers at gun point who indicated that he was the subject of a bank robbery investigation. The defendant clearly was seized under the "free to leave" standard announced in United States v. Mendenhall, 446 U.S. 544, 554 (1980) which was reaffirmed in Florida v. Royer, 460 U.S. 491, 501 (1983).

In his search warrant affidavit, Detective Edwards indicated that the defendant was stopped for a red light violation. Even assuming *arguendo* that the defendant failed to stop for a red light, the police would only have had probable cause to believe that a minor civil traffic violation had occurred. Consequently, they were permitted to stop the car and possibly to ask the occupant to exit the vehicle. See, Pennsylvania v. Mimms, 434 U.S. 106 (1997). However, once the

police confirmed Mr. Newell's identity and that he was authorized to operate his truck, both he and his vehicle should have been released. The officers' prolonged detention of him and the search of his truck by a narcotics detection dog violated the Fourth Amendment because it was unreasonable. United States v. Sowers, 136 F.3d 24 (1st Cir. 1998). *See also*, United States v. Sugar, 322 F.Supp. 2d 85, 91-92, (D.Mass. 2004)(Even if initial stop for traffic violation justified, driver's refusal to submit to search did not provide basis for holding vehicle for canine search once investigation of traffic violation complete). Therefore, the stop, removal, and detention of the defendant as well as the warrantless search of his truck violated his Fourth Amendment rights.

>   III. Probable Cause for the Search of the Truck Cannot Be Based Upon Mako's Conduct Because the Dog's Training and Reliability in Contraband Detection Are Unknown.

Even if this Court finds that the initial stop and the defendant's continued detention were lawful, the Government has the burden of proving that the search and seizure of his truck were based on probable cause. Carroll v. United States, 267 U.S. 132, 155-156 (1925). This is true when, as in the case at bar, probable cause is based on the alleged "alert" of a dog. *See*, United States v. Place, 462 U.S. 696 (1983).

The finding of probable cause is contingent on the training and reliability of the alerting dog. *See*, United States v. Colon, 845

-10-

F.Supp 923, 928 (D.P.R. 1994). In this case, there is no evidence that Mako was ever trained to detect currency, the only object to which he allegedly alerted. Further, it appears that Mako's most recent training and certification in narcotics detection took place in 2000, at least two years prior to the search of Mr. Newell's truck.

Even if Mako had more recent narcotics detection training, "[t]he fact that a dog is certified should not be sufficient in and of itself to establish probable cause." United States v. Florez, 871 F.Supp. 1141, 1420 (D.N.M. 1994). Certified dogs have been known to falsely alert. See, Doe v. Renfrow, 475 F.Supp. 1012 (N.D.Ind.1979), aff'd in part, 631 F.2d 91 (7th Cir. 1980)(no drugs found on thirty-three out of fifty junior high and high school students to which narcotics dogs alert); United States v. Brown, 731 F.2d 1491, modified, 743 F.2d 1505 (11th Cir. 1984)(no drugs found after narcotics dog alerted to luggage at airport); United States v. Young, 745 F.2d 733 (2d Cir. 1984)(no drugs found after narcotics dog alerted to defendant's apartment.) In fact, no drugs were found in Mr. Newell's truck.

Where documentation on a narcotics dog is absent or incomplete, a proper evaluation of a dog's reliability cannot take place. *See*, Horton v. Goose Creek Indep. Sch. Dist., 690 F.2d 470 (5th Cir. 1982) (holding assertion that narcotics dogs were "quite reliable" insufficient where no comprehensive records kept of those incidents where dogs' falsely alerted and remanding for a development of the

-11-

record on the dogs' reliability.) Since Trooper Reid destroyed Mako's records during the litigation of this case, the Government cannot show that Mako was reliable; therefore, it cannot meet its burden of showing probable cause to search the defendant's truck.

Finally, Trooper Reid's conduct in entering Mr. Newell's truck with Mako on two occasions, during the second of which he rearranged items for the dog's inspection, constituted further violations of the defendant's Fourth Amendment rights. Arizona v. Hicks, 480 U.S. 321 (1986). The search conducted by Trooper Reid and Mako was not incident to arrest or based upon probable cause; consequently, it was unjustified. Contrast, United States v. Belton, 453 U.S. 454 (1981); Thorton v. United States, ___ U.S. ___, 124 S.Ct. 2127 (2004) with, California v. Acevedo, 500 U.S. 565 (1995).

### V. The Fruits of the Illegal Search and Seizure Must Be Suppressed.

Where, as here, an individual has been illegally seized, the court is required to determine whether evidence discovered must be suppressed as fruit of the illegal detention. If the evidence was obtained by exploiting the violation of the defendant's Fourth Amendment rights, then it must be suppressed. Wong Sun v. United States, 371 U.S. 471, 485 (1963); United States v. Scott, 270 F.3d 30, 40 (1st Cir. 2001).

Here, the currency was found as a direct consequence of a search and seizure by the police that exceeded the scope legally permissible

-12-

when stopping the defendant's truck for a red light violation. Furthermore, the actions undertaken by the officers following the stop were not reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop. *See*, United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998). Thus, the currency and any other evidence, including statements, obtained as a result of the stop and detention were the fruit of the primary illegality and must be suppressed. Wong Sun v. United States, 371 U.S. 471, 485 (1963); United States v. Scott, 270 F.3d 30, 40 (1st Cir. 2001).

### REQUEST FOR EVIDENTIARY HEARING AND LEAVE TO FILE ADDITIONAL DOCUMENTS

Defendant respectfully requests an evidentiary hearing on this motion.

The Government bears the burden of justifying the warrantless stop, search, and seizure of defendant. *See*, e.g., United States v. Roch, 5 F.3d 894, 897 (5th Cir. 1993) (government bears burden of proving reasonable suspicion sufficient to justify Terry stop). Therefore, the defendant respectfully reserves the right to amend this motion and/or to file a reply memorandum and additional affidavits after receipt of the Government's response and following the conclusion of the evidentiary hearing.

|  |  |
|---|---|
|  | Respectfully submitted,<br>GARY NEWELL,<br>By his attorney, |
| DATED: November 22, 2004 | */s/ Debra A. DelVecchio*<br>Debra A. DelVecchio<br>B.B.O. #542139<br>DEL VECCHIO & HOUSEMAN<br>The Perry Building<br>15 Front Street<br>Salem, MA  01970<br>(978) 740-5999 |

**CERTIFICATE OF SERVICE**

I hereby certify that a true and complete copy of this document was served upon the attorney of record for each party and each party appearing *pro se*, by mail, ~~hand delivery, facsimile,~~ a courier service, on _11/22/04_

*/s/ Debra A. DelVecchio*

# DELVECCHIO & HOUSEMAN
## ATTORNEYS AT LAW

The Perry Building
15 Front Street
Salem, Massachusetts 01970

Debra A. DelVecchio
Scott D. Houseman

Telephone (978) 740-5999
Telecopier (978) 740-9434

April 6, 2004

<u>By FAX to (617) 748-3965
& First Class Mail</u>

AUSA Rachel E. Hershfang
United States Attorney's Office
Moakley Federal Court House
One Courthouse Way, 10th Floor
Boston, MA  02110

    RE:  <u>United States v. Douglas Bannerman et al.</u>
         <u>CRIM. NO.  03-10370-DPW</u>

Dear Ms. Hershfang:

   As you know, in late March, I was appointed to represent Gary Newell in the above-captioned case. Thank you for forwarding your letter dated March 15, 2004 advising counsel of the DEA's drug retention policy.

   This letter will serve as Mr. Newell's formal request that the DEA forego destruction of any evidence that the Government alleges is attributable to my client, either directly or as relevant conduct, during the pendency of this case to permit inspection and testing. If any portion of the evidence has been destroyed already, please notify me immediately.

   Thank you for your cooperation and courtesy.

                             Very truly yours,

                             Debra A. DelVecchio

DAD/ss
cc: Mr. Gary Newell
    All Counsel of Record (By First Class Mail)



DEFENDANT'S
EXHIBIT
A



**U.S. Department of Justice**

*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

United States Courthouse, Suite 9200
1 Courthouse Way
Boston, Massachusetts 02210

August 16, 2004

By First Class Mail

Debra A. DelVecchio
DelVecchio & Houseman
Perry Building
15 Front St.
Salem, MA 01970

  Re: United States v. Douglas Bannerman et al.
    Criminal No. 03-10370-DPW

Dear Ms. DelVecchio:

  Further to our agreement regarding my production of training logs and certifications for Mako, a State Police drug-detection dog, I was informed this morning that most of those records have apparently been destroyed. Trooper Mark Reid, Mako's handler, informed me that he has been unable to locate Mako's training logs, and that he believes they were destroyed after Mako's retirement (in about April of this year). Trooper Reid has undertaken to get copies of Mako's certifications (I have impressed upon him the importance of doing this promptly), which I will forward to you as soon as I receive them.

          Very truly yours,

          MICHAEL J. SULLIVAN
          United States Attorney

     By: _____
        Rachel E. Hershfang
        Assistant U.S. Attorney



DEFENDANT'S EXHIBIT B