UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE
2004 NOV 23 P 3:55
U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES OF AMERICA )
v. ) CRIMINAL NO. 03-10370-DPW
GARY NEWELL, Defendant )

DEFENDANT GARY NEWELL'S MOTION TO DISMISS

Defendant Gary Newell moves that this Court dismiss the charges pending against him. As reason therefore, the defendant states the following:

First, prior to the initiation of federal charges against the defendant, the Government converted all of the currency it found in two Federal Express boxes seized from the defendant's truck ("the packages") into a cashier's check without conducting any scientific testing for the presence of narcotics. The packages were seized as a result of a warrantless search by police officers involving a narcotics detection dog named Mako during a traffic stop of the defendant's truck on January 24, 2003.

Second, after the defendant was charged in this case, defense counsel made a formal request for the preservation of all evidence. Shortly thereafter, the investigating officer who was Mako's handler and primary record keeper reportedly destroyed virtually all of the records related to Mako's training and performance in narcotics detection. These records are important because federal officers investigating the defendant relied upon Mako's conduct in "alerting" on the packages as probable cause for the presence of narcotics in his truck. In fact, when the search warrant was executed, no narcotics were found there.

Despite this loss of evidence, the Government intends to offer testimony derived from the seizure and inspection of the packages and currency, the key pieces of tangible evidence against the defendant in this case. As a result of the conduct of the Government's agents, the defendant never had an opportunity to inspect, evaluate, or test the missing evidence. The conduct of the Government's agents materially and irrevocably impairs his ability to evaluate and to confront the central evidence in the Government's case against him at trial.

STATEMENT OF THE FACTS

On January 24, 2003, Cambridge Police Detective Stephen Edwards applied for a warrant to search the defendant's 1998 Ford pick up truck. Most of the information contained in Detective Edward's affidavit supporting his search warrant application was obtained as a result of a traffic stop involving the defendant and his truck earlier that day.

The facts surrounding the traffic stop are set forth in detail in the Defendant's Memorandum in Support of his Motion to Suppress Evidence, dated November 22, 2004, at pp. 1-5, and its supporting Affidavits and Exhibits, which were filed with the Court on November 22, 2004 and are incorporated herein by reference. A copy of the Search Warrant and the warrant Application with its supporting Affidavit are attached as Exhibits A and Exhibit B, respectively, to the Defendant's Motion for Franks Hearing and Motion to Suppress Evidence, which also were filed with the Court on November 22, 2004 and likewise are incorporated herein by reference. The particular facts most pertinent to this Motion to Dismiss are as follows.

During the course of the defendant's traffic stop, the investigating officers called Massachusetts State Trooper Mark

Reid and his narcotics detection dog Mako to the scene to assist them. Trooper Reid was described in the search warrant affidavit as a ten year veteran of the Massachusetts State Police, a K-9 Unit officer for over seven years, and nine year-old German Shepherd Mako's handler since 1996. According to the affidavit, Trooper Reid and Mako were trained in narcotics detection and had been working together since 1996.

When they arrived at the scene of the traffic stop at issue in this case, Trooper Reid directed Mako to inspect the defendant's truck, inside and out. The first time Mako came into contact with the packages, which were inside a white plastic bag at the rear of the defendant's truck bed, the dog did not have any reaction to them. Trooper Reid then moved items inside the truck bed forward and re-deployed Mako. This time, Mako reportedly "alerted" to the packages and bit into one of them, creating a hole. The police officers then looked through the hole and found currency.

Detective Edwards immediately applied for and obtained a warrant from the Cambridge District Court to conduct a search of the defendant's truck, including the packages, for "controlled substances as defined in [M.G.L.] C94c (sic), U.S. currency, and/or any other proceeds related to the distribution of controlled substances." In executing the warrant later that day, the police found $221,910 in currency in the packages but no controlled substances.

The investigating officers took certain items they found inside the defendant's truck during the execution of the search warrant on January 24, 2003 and submitted them for laboratory analysis. In particular, on January 27, 2003, they had two tarps taken from inside a cooler in the truck bed tested for the presence of narcotic substances with negative results. *See*, DEA

Laboratory Report, attached as Exhibit 1. However, they never submitted the currency found in the packages for chemical analysis. Instead, on January 29, 2003, the officers reportedly converted the currency into a bank check made payable to the U.S. Marshal Service.

The defendant was not charged with any crime relating to the traffic stop on January 24, 2003 until December 4, 2003 when he was indicted in this case for conspiracy to distribute marijuana. On April 6, 2004, undersigned counsel formally requested that the Government preserve all evidence related to the charges against the defendant. On June 10, 2004, defense counsel formally requested, *inter alia*, documentation relating to Trooper Reid and Mako's training and performance in drug detection.

In August, 2004, the Government acknowledged that it agreed to provide training logs and certifications for Mako. However, it notified defense counsel that, according to Trooper Reid, all of Mako's records had been "destroyed" while in his custody "in about April of this year" when the dog was retired from service. (August 16, 2004 Letter from AUSA Rachel E. Hershfang, attached as Exhibit 2). Defense counsel has not been provided with any of the details surrounding Trooper Reid's disposal of these records.

Subsequent investigation has revealed that Trooper Reid, as Mako's handler, was the sole record keeper and custodian of the dog's training records. Further, the only items that defense counsel has obtained from the Government or located relative to Mako's training and proficiency are three certificates dated 1996, 1998, and 2000, which together are attached as Exhibit 3. These certificates purportedly confirm that Mako was trained in narcotics detection only. Upon information and belief, Mako was never trained in currency detection.

## ARGUMENT

I. The Government's Prejudicial Failure to Preserve the Currency and the Detector Dog's Training Records Violates the Defendant's Rights Under the Due Process Clause Requiring the Dismissal of the Charges Against Him

The Federal Rules of Criminal Procedure provide that:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>
> (i) the item is material to preparing the defense;
> (ii) the government intends to use the item in its case-in-chief at trial; or
> (iii) the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16 (a)(1)(E).

Despite the plain language of Rule 16, the Government irrevocably denied the defendant access to the currency it alleges that he possessed by converting it to a cashier's check before it filed any charges against him. In addition, the Government's failure to test this currency for the presence of narcotics prior to its conversion to a cashier's check deprived the defendant of potentially exculpatory evidence. This is true because Mako, who reportedly was never trained in currency detection, appears to have demonstrated a "false alert" when he bit into the packages since no narcotics was found inside.

The Government's conduct in depriving the defendant access to this key evidence is compounded by the apparent deliberate misconduct of an experienced dog officer who destroyed the only

copy of his detection dog's training and performance records while the case was being litigated. Trooper Reid has foreclosed the defendant's ability to identify and to confront at trial the weaknesses or limitations in the dog's otherwise-documented detection abilities that formed the basis for the issuance of the warrant to search the defendant's truck.

In Arizona v. Youngblood, 488 U.S. 51, 56-58 (1988), the Supreme Court examined this area of law which "might loosely be called the area of constitutionally guaranteed access to evidence." Id. at 55. In Youngblood, a child rape case, the government had "disclosed relevant police reports . . .[and] provided respondent's expert with the laboratory reports and notes and respondent's expert had access to the swab and to the clothing [of the victim]." Id. at 55. The police, however, had negligently failed to refrigerate the victim's clothing and to perform tests on the semen samples. Id. at 58. In rejecting the defendant's due process claim, the Supreme Court noted the absence of bad faith on the part of the police. Id. at 58-59.

To date, the Government has provided no reasonable explanation for the agents' conduct in failing to test or to preserve key evidence in this case. Since these failures were the work of experienced law enforcement agents without any apparent justification, the defendant maintains that they are the product of bad faith.

Even assuming *arguendo* that there was no malicious intent on the part of the officers in the case at bar, several critical facts distinguish the holding in Youngblood requiring bad faith on the part of the police. First, in Youngblood, the government did not "attempt to make any use of the [lost evidence] in its own case in chief." Id. at 56. Because of the failure to properly test or preserve the evidence, neither side's experts

conducted successful tests.  In contrast, in this case, the Government must use testimony of the lost evidence:  the currency is the only tangible evidence identified during the traffic stop or subsequent search of the defendant's truck that links him with the alleged marijuana conspiracy.

Further, given the detection dog's apparent lack of training in currency detection, the Government's failure to test the currency for the presence of narcotics is most harmful to the defendant who is precluded from investigating whether the dog's reaction was, in fact, a "false alert."  This situation is compounded by the Government's agent's subsequent destruction of Mako's training and performance records that presumably would have disclosed the dog's competence and reliability in drug detection.  The destruction of these records also prevents the defense from evaluating whether, in providing information under oath on the search warrant application, Agent Edwards and/or Trooper Reid may have misrepresented Mako's drug detection "track record."

In Youngblood, the evidence lost was simply a piece of "potentially useful evidence" in a case which the government did not rely upon the lost or destroyed evidence.  Id. at 58.  In this case, the currency and Mako's detection of it are the central evidence against the defendant.  But for Mako's conduct in alerting on the packages and partially tearing them open, no currency would have been identified during the traffic stop.  The discovery of this currency and the assumption that narcotics likewise must be present in the package for Mako to react to it were used by the police to establish probable cause for the issuance of the search warrant.  In fact, no narcotics were ever found.  This situation made objective verification of the absence or presence of narcotics on the currency itself much

more vital to the defendant than it would be to the Government. The absence of the dog's performance records heightens the due process violation at issue in this case. Under these circumstances, allowing the Government to prosecute Mr. Newell violates the "'fundamental fairness' requirement of the Due Process Clause." Id. at 58, *quoting* Lisenba **v.** California, 314 U.S. 219, 236 (1941).

In short, Youngblood's bad faith holding is merely an explication of this fairness requirement as applied to a general failure to preserve evidence not central to the prosecution and not relied upon by the government. *See*, United States v. Belcher, 762 F. Supp. 666, 672 (W.D. Va. 1991)("In a case where State officials intentionally destroy evidence that is absolutely crucial and determinative to a prosecution's outcome, the Court holds that the Youngblood [bad faith] caveat does not apply.")

The First Circuit has recognized that even good faith is not an absolute defense for the government under Youngblood in the face of destroying or altering evidence that "might otherwise have exculpated defendant." United States v. Alston, 112 F.3d 32, 35 (1st Cir. 1997). Because "fundamental fairness" is the touchstone of due process analysis, "the courts have been willing to examine closely any substantial threats to the fairness of the trial process." Id. Another judge in this district dismissed an indictment because the destruction of an agent's interview notes "deprived [the defendant] of relevant, and perhaps highly exculpatory, evidence important to the resolution of the critical factual and legal questions on which [the] prosecution rest[ed]." United States v. Pollack, 417 F.Supp. 1332, 1342-43 (D. Mass. 1976).

The Supreme Court's decision in California v. Trombetta, 467 U.S. 479 (1984), a precursor to Youngblood, supports dismissal in this case. In Trombetta, the Court found no constitutional violation arising from the police's failure to preserve the actual breath sampled by the breathalyzer in a drunk driving prosecution. Id. at 491. The failure to preserve, however, arose from the police following normal procedures in good faith. Id. at 488. The same cannot be said in this case. Moreover, the defendant in Trombetta was given the opportunity to submit to blood and urine tests; had he so submitted, the police would have preserved the blood or urine. Id. at 490. Mr. Newell had no such equivalent opportunity to test the currency or the detector dog's reliability. Further, the defendant in the case at bar cannot obtain "comparable evidence [to the actual currency seized] by other reasonably available means." Id. at 489.

In United States v. Belcher, 762 F. Supp. 666 (W.D. Va. 1991,) a case factually similar to the one at bar, the Court applied Trombetta and dismissed the prosecution against a defendant charged with manufacturing and possessing marijuana with intent to distribute. In Belcher, although the government was prepared to offer the testimony of agents that they had seen plants that were marijuana, the plants themselves had been destroyed prior to the initiation of the prosecution. Even though the Court indicated that it was "certain that law enforcement officials are almost always correct in determining, by a simple visual inspection, whether a plant is marijuana or not," it dismissed the prosecution as tainted by the destruction of the material and central evidence in the case: the plants. Id. at 673. Notably, the Court made no finding of bad faith in

Belcher. Id. For the same reasons, this Court should dismiss *with prejudice* the pending charges against Mr. Newell.

II. The Court Should Exercise Its Supervisory Powers to Dismiss the Case with Prejudice

In United States v. Hasting, 461 U.S. 499 (1983), the Supreme Court held that, "guided by considerations of justice, federal courts may use their supervisory powers to remedy a violation of recognized rights, to preserve judicial integrity, and to deter illegal conduct." Id. at 505. (*quoting* McNabb v. United States, 318 U.S. 332, 341 (1943)). More recently, the First Circuit recognized the continuing authority of the Supreme Court's holding in United States v. Santana, 6 F.3d 1, 9-10 (1993). The First Circuit noted that supervisory power can be invoked "to secure enforcement of 'better prosecutorial practice and reprimand of those who fail to observe it." Id. at 10.

In this case, the Government's conduct has tainted this prosecution and prejudiced Newell's ability to defend himself by two separate and distinct acts of evidence destruction. First, prior to the initiation of this prosecution, government agents seized and examined the evidence they hope to introduce against the defendant at trial. They conducted all of the scientific testing necessary, in their view, to support the federal drug charges brought against the defendant. These agents decided which examinations to perform and which ones to forego. Prior to filing any charges against the defendant, government agents converted the cash they seized from Mr. Newell's truck into a cashier's check. Defense counsel cannot examine the cash nor have it independently tested by its own experts. Second, after the defense filed a formal request for evidence preservation, an

experienced officer destroyed his detection dog's only set of training and performance records without explanation.

Police misconduct in this case has ensured that the central tangible evidence in the case previously available only to the Government cannot be effectively confronted by the defendant or evaluated by a jury at trial. In order to preserve the integrity of the judicial process as well as remedy the prejudice to the defendant's constitutional rights under the Sixth and Fourteenth Amendments to the assistance of counsel, confrontation of the evidence against him, and due process of law, the Court should exercise it supervisory powers to dismiss the Indictment against this defendant with prejudice.

REQUEST FOR EVIDENTIARY HEARING

Defendant respectfully requests an evidentiary hearing on this motion. The defendant also reserves the right to amend this motion and/or to file a reply memorandum and supplemental documents, including additional affidavits, after receipt of the Government's response and hearing.

DATED: November 23, 2004

Respectfully submitted,
GARY NEWELL,
By his attorney,

Debra A. DelVecchio
B.B.O. #542139
DEL VECCHIO & HOUSEMAN
The Perry Building
15 Front Street
Salem, MA 01970
(978) 740-5999

**CERTIFICATE OF SERVICE**

I hereby certify that a true and complete copy of this document was served upon the attorney of record for each party and each party appearing *pro se*, by ~~mail,~~ hand delivery, ~~facsimile~~ ~~service~~, on and mail on 11/23/04



**U.S. Department of Justice**

*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*United States Courthouse, Suite 9200*
*1 Courthouse Way*
*Boston, Massachusetts 02210*

August 18, 2004

By First Class Mail
Debra A. DelVecchio
DelVecchio & Houseman
Perry Building
15 Front St.
Salem, MA 01970

Re: United States v. Gary Newell
Criminal No. 03-10370-DPW

Dear Ms. Delvecchio:

Please find enclosed certifications for "Mako," the narcotics detection dog, for 1996, 1998, and 2000, Bates numbered 5027-5029, which I received yesterday. The Trooper is pursuing certifications for the odd-numbered years, which I will pass on to you upon receipt.

Very truly yours,

MICHAEL J. SULLIVAN
United States Attorney

By: [signature]
Rachel E. Hershfang
Assistant U.S. Attorney

Enclosures

cc: M. Page Kelley (with encl.)

DEFENDANT'S EXHIBIT 3

Blumberg No. 5114

**U.S. Department of Justice**
**Drug Enforcement Administration**

EXPEDITE

## REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED

| 1. HOW OBTAINED (Check) | | | 2a. FILE NO. | 2b. PROGRAM CODE | 3. G-DEP ID |
|---|---|---|---|---|---|
| ☐ Purchase  ☒ Seizure  ☐ Free Sample  ☐ Lab. Seizure  ☐ Money Flashed  ☐ Compliance Sample (Non-Criminal)  ☐ Internal Body Carry  ☐ Other (Specify) | | | [redacted] | | [redacted] |

| 4a. WHERE OBTAINED (City, State/Country) | 4b. DATE OBTAINED | 5. FILE TITLE |
|---|---|---|
| Boston, Massachusetts | 01-24-2003 | [redacted] |

| 6a. REFERRING AGENCY (Name) | 6b. REFERRAL ☐ Case No. OR ☐ Seizure No. | 7. DATE PREPARED | 8. GROUP NO. |
|---|---|---|---|
| | | 01-27-2003 | 1 |

| 9. Exhibit No. | 10. FDIN (10 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | 13. Seized | 14. Submitted | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| 7 | | Marijuana Residue | 1 green plastic tarp & 1 blue canvass tarp Sealed in a DEA Evidence Envelope dated 1-27-03 | | 927.99 | |
| | | | ****PLEASE EXPIDITE**** | | | |

16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG?  ☒ NO (included above)  ☐ YES (if Yes, enter exhibit no. and describe original container fully)

**REMARKS:**
On 1-27-2003, a Massachusetts State Search Warrant was executed on a Ford F-150 pickup truck, Oregon WHZ-214. A smell of marijuana was detected in the rear of the pickup. A large cash seizure was also made from the truck. It is suspected that the tarps were used to cover marijuana. S/A Dennis Barton seized the tarps and secured them in a locked closet in the Boston DO on 1-24-03. On 1-27-03, S/A Barton processed the tarps as Exhibit 7 and stored them a personal locked cabinet until forwarded to the NERL via RRRM.
**LAB PLEASE CONDUCT ANALYSIS ON TARPS FOR TRACE AMOUNTS OF MARIJUANA RESIDUE**

| 17. SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|
| [signature] Dennis A. Barton | G/S Mark M. |

### LABORATORY EVIDENCE RECEIPT REPORT

| 19. NO. PACKAGES | 20. RECEIVED FROM (Signature & Date) | 21. Print or Type NAME and TITLE |
|---|---|---|
| 1 | [signature] Dennis A. Barton  782231 | S/A Dennis Barton |

| 22. SEAL ☐ Broken ☒ Unbroken | 23. RECEIVED BY (Signature & Date) [signature] 1-31-03 | 24. Print or Type NAME and TITLE Inge Milo |
|---|---|---|

02/21/03 pm

### LABORATORY REPORT

**25. ANALYSIS SUMMARY AND REMARKS**

Exhibit #7: No controlled substances detected (NCSD).

Gross Wt. = 921.3 g
Net Wt. = 880.4 g

Received 2 tarps

DEFENDANT'S EXHIBIT 1

SEE CERTIFICATION ON BACK

| 26. Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | CONCENTRATION | | | 32. AMT. OF PURE DRUG | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| | | | 29. Strength | 30. Measure | 31. Unit | | |
| 7 | 155527 | no conttrolled substances detected | — | | | — | 880.4 g (2 tarps) |

| 34. ANALYST (Signature) | 35. TITLE | 36. DATE COMPLETED |
|---|---|---|
| Jack A. Fasanello [signature] | S/Forensic Chemist | 02/20/03 |

| 37. APPROVED BY (Signature & Date) | 38. TITLE | 39. LAB. LOCATION 4347 |
|---|---|---|
| Thomas M. Black [signature] | Laboratory Director | New York |

DEA Form

**U.S. Department of Justice**

*United States Attorney*
*District of Massachusetts*

*Main Reception: (617) 748-3100*

*United States Courthouse, Suite 9200*
*1 Courthouse Way*
*Boston, Massachusetts 02210*

August 16, 2004

By First Class Mail

Debra A. DelVecchio
DelVecchio & Houseman
Perry Building
15 Front St.
Salem, MA 01970

Re: United States v. Douglas Bannerman et al.
Criminal No. 03-10370-DPW

Dear Ms. DelVecchio:

Further to our agreement regarding my production of training logs and certifications for Mako, a State Police drug-detection dog, I was informed this morning that most of those records have apparently been destroyed. Trooper Mark Reid, Mako's handler, informed me that he has been unable to locate Mako's training logs, and that he believes they were destroyed after Mako's retirement (in about April of this year). Trooper Reid has undertaken to get copies of Mako's certifications (I have impressed upon him the importance of doing this promptly), which I will forward to you as soon as I receive them.

Very truly yours,

MICHAEL J. SULLIVAN
United States Attorney

By: [signature]
Rachel E. Hershfang
Assistant U.S. Attorney

# THE COMMONWEALTH OF MASSACHUSETTS
# DEPARTMENT OF STATE POLICE
# CANINE SECTION

## CANINE TRAINING PROGRAM

*May 17, 1996*

## *Tpr Mark Reid & K-9 "Mako"*

HAVE SUCCESSFULLY COMPLETED THE FOLLOWING PRESCRIBED CANINE COURSE

*Narcotics Detection - Marijuana, Cocaine, Heroin, Hash-Hish*

Colonel Reed V. Hillman

SUPERINTENDENT

Cpl. [signature] NHSP

EXAMINER(S)

Lieutenant Walter F. Hackett

Lt Walter F. Hackett

SECTION COMMANDER

96-050

Department of State Police
Certification
Presented to
Trooper Mark Reid
Mako
this is to certify the above named officer and canine
has successfully met all criteria required by the
New England State Police Administrator's Conference
in the specialty of:
Narcotic Detecting Canine
(marijuana, hashish, heroin, cocaine, crack cocaine)
April 7, 1998
Lieutenant Walter A. Keenan #0372 Section Commander
Cpl. Richard D'Amelo, New Hampshire State Police
Colonel / Superintendent Reed V. Hillman
5028

# COMMONWEALTH OF MASSACHUSETTS
# DEPARTMENT OF STATE POLICE
# CANINE SECTION

*June 6, 2000*

*Tpr Mark Reid & K-9 "Mako"*

HAVE SUCCESSFULLY MET THE CRITERIA REQUIRED BY THE NEW ENGLAND STATE POLICE ADMINISTRATOR'S CONFERENCE IN THE FOLLOWING CANINE SPECIALTY

***NARCOTICS DETECTION***

Colonel John DiFava
MASSACHUSETTS STATE POLICE
SUPERINTENDENT

Sergeant Cleveland Coats
TRAINING DIRECTOR

Sergeant Bruce F. Hloms
SECTION COMMANDER