UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA      )
                              )    No. 03-10370-DPW
        v.                    )
                              )
3. GARY NEWELL,               )
                              )
            Defendant.        )

**GOVERNMENT'S OPPOSITION TO GARY NEWELL'S
MOTION TO SUPPRESS (AND MOTION TO FILE OVERLONG BRIEF)**

The United States of America, by its attorneys, United States Attorney Michael J. Sullivan, and Assistant U. S. Attorney Rachel E. Hershfang, hereby opposes Gary Newell's ("Newell") motion to suppress evidence seized from his pickup truck pursuant to a search conducted on January 23, 2003, and statements made that day (docket no. 168). This opposition also addresses suppression arguments made at pp. 5-9 of Newell's Motion for a Franks Hearing and Motion to Suppress Evidence (docket no. 166) ("Franks Mot.").

The government respectfully requests leave to file this brief, which is in excess of 20 pages. In support of this request, the government states that Newell raises many issues in both of his motions, and that those issues cannot fairly be addressed in 20 pages.

**I.    Facts, Charges.**

Gary Newell ("Newell") is one of nine defendants charged in a marijuana conspiracy. The Drug Enforcement Administration

1

("DEA") began its investigation in September, 2001. The investigation culminated, in January through December, 2003, in court-authorized interceptions on four telephones. None of these telephones was Newell's; two were used by defendant Douglas Bannerman ("Bannerman") and two by Kurt Walter ("Walter").

Bannerman was the local marijuana source for the conspirators and Walter his biggest customer/redistributor. See Affidavit of Special Agent Dennis Barton ("Barton Aff.") ¶¶44-56, 57-79 (attached hereto at Tab 1). Newell, an Oregon resident, was a driver who transported marijuana to Boston and proceeds from Boston. Barton Aff. ¶16.

DEA located Newell through a combination of careful investigative work and serendipity. Bannerman had been reported to DEA to use a voicemail box (that is, a telephone number not attached to a phone, but used to receive messages) to communicate with his drug associates. Barton Aff. ¶14 & n.2. In January, 2003, DEA had (with court permission) installed a trap and trace device on the voicemail box that Bannerman was using at the time. See Barton Aff. ¶17. Between January 20, 2003 and January 22, 2003, that trap and trace showed incoming calls from locations across the United States, moving from west to east. The first call came from a telephone at a Holiday Inn West in Lakewood, Colorado. Barton Aff. ¶17. Hotel records from that Holiday Inn showed that a Gary Newell, driving a truck with Oregon plates,

was registered there on the night of January 20.  <u>See</u> DEA-6
report dated 2/3/03, entitled "Phone activity of Douglas
BANNERMAN prior and after the seizure of $221,910 on January 24,
2003," ("Phone Rep.") ¶1b (attached hereto at Tab 2).   The next
call was from a telephone in Boonville, Missouri, on January 21,
2003; the final from Medina, Ohio, on January 22, 2003.  Barton
Aff. ¶17; <u>see also</u>, Phone Rep. ¶¶4c, 7c.

     Pen register data showed that Newell had called the Holiday
Inn Express in Cambridge in October, 2002.  <u>See</u> Phone Rep. ¶12c.
This piece of information, combined with two other facts (his
having stayed at a hotel in the same chain while in Colorado, and
a call to the Bannerman voicemail box from the Cambridgeside
Galleria mall on the morning of January 23, 2003), prompted DEA
to conclude Newell was in town.  Barton Aff. ¶19; <u>see also</u> Phone
Rep. ¶10c.

     On the morning of January 24, 2003, believing that NEWELL
might stay there, a DEA surveillance team set up on the Holiday
Inn Express.  At approximately 9:15 a.m., a DEA agent saw a Ford
F-150 pick-up truck with Oregon plates parked in the front
parking lot of the Holiday Inn Express.  Barton Aff. ¶19.  About
ten minutes later, a man (later identified as Newell) was seen
sitting in the truck.  <u>Id</u>.

     Agents followed Newell to the Lechmere Auto Wash at 262
Monsignor O'Brien Highway.  Barton Aff. ¶19.  At the car wash,

agents saw suspected coconspirator Kurt Walter pull up in a white
BMW sedan (registered to him).  Barton Aff. ¶20.  Walter walked
over and talked with Newell at his truck; Newell then pulled his
truck into a car-wash bay and washed it.  Id.  Walter,
meanwhile, walked back and forth between his BMW and Newell's
truck.  Id.

On one of those trips, agents saw Walter take a tan-colored
duffel bag out of his car, then put the bag in the front
passenger side of Newell's truck.  Barton Aff. ¶21.  Agents later
saw NEWELL take this bag and put it in the enclosed bed of the
Ford truck.  Barton Aff. ¶21; see also, DEA-6 report dated 1-31-
03, entitled, "Surveillance of Gary NEWELL and Seizure of
$221,091.00 USC (Exs N-51) on 1-24-03.  Acquisition of Exs. 7, N-
48, N-49, N50, N-51, N-52, N-54, N-55, N-56, & N-57" ("Surv.
Rep.") ¶7 (attached hereto at Tab 3).   At approximately 10:00
a.m., agents saw WALTER leave the parking lot, driving his own
car.  Surv. Rep. ¶8.

Agents then, about five minutes later, saw another man go to
Newell's truck and put something in the truck bed.  This man left
the area and was not followed.  Barton Aff. ¶ 22.

About five minutes after that (around 10:10 a.m.), agents
saw Newell's Ford truck pull out of the car wash.  Barton Aff.
¶23.  As he was leaving the car wash, three agents saw Newell run
a red light.  Surv. Rep. ¶10.  A few minutes later, at about

4

10:15 a.m., with the help of local police (who had already been contacted for back-up), Newell's truck was stopped.  Surv. Rep. ¶¶10-11, Barton Aff. ¶23.

In response to the Cambridge police requests for license and registration, Newell produced a license and registration in his own name, with an Oregon address.  Barton Aff. ¶23; Surv. Rep. ¶11.  Detective Stephen Edwards, a Cambridge Police officer assigned to the DEA group conducting this investigation, joined the group by the side of the truck soon thereafter.  See Surv. Rep. ¶11.  Looking through the windows in the cap of the truck, Detective Edwards saw skis, ski boots, a cooler, a toolbox, and a plastic bag with Federal Express boxes in it.  Id.  He did not see any suitcase, nor was there any winter clothing visible in the truck.  Id.

Detective Edwards began speaking with Newell.  He asked Newell where he was staying, and Newell identified the Holiday Inn Express, from which he said he had checked out.  Id. ¶12. Shortly thereafter, Newell said that, although he had paid his bill, he had to return to the hotel room.  Id.  In response to Detective Edwards' question about what he was doing in the area, Newell said that he was going skiing in New Hampshire.  Id.

While he spoke with Newell, Detective Edwards noticed that Newell was looking around in a way that appeared to Detective Edwards to indicate nervousness.  Id. ¶13.  In particular,

whenever Detective Edwards approached the rear of the pickup truck, he saw Newell paying close attention to his (Edwards') actions. Id. Meanwhile, the uniformed Cambridge police officers ran Newell's criminal record and reported back that he had an adult record dating back decades, including narcotics convictions. Id. ¶14. [As noted in Newell's motion for a Franks hearing, he truly has only one narcotics conviction.]

Detective Edwards confronted Newell with his suspicions. He told Newell that his demeanor indicated to Edwards (and others) that the truck and, specifically, the FedEx boxes, held contraband. Id. ¶15. Detective Edwards asked for Newell's consent to search the truck, and Newell assented. Id. During his pass through the truck, Detective Edwards focused specifically on the Federal Express boxes, asking Newell what was in them. Newell said they held presents for his girlfriend, and refused to authorize Detective Edwards to open the boxes. Id.

His suspicions on the rise, Detective Edwards informed Newell that he wanted to have a dog (presumably understood to be a drug-sniffing dog) come to the scene. Id. ¶16. Again, Detective Edwards asked Newell about the FedEx boxes; again, Newell demurred, saying words to the effect of "we're just going to have to wait for your guy" [understood as a reference to the dog-handler]. Id. The dog officer was called. Id.

In response to the call, Trooper Mark Reid ("Trooper Reid")

6

of the Massachusetts State Police arrived, with his drug-
detection dog, Mako.  As Detective Edwards subsequently reported
in his affidavit in support of a search warrant, Mako and Trooper
Reid had been working together since 1996, when they completed a
certification program under the auspices of the Connecticut State
Police.  Affidavit of Detective Stephen Edwards in Support of
Search Warrant ("Edwards Aff.") at 3, ¶1 (attached hereto at Tab
4).  Mako was certified, after completing that program, by the
New England State Police Administrators' Conference ("NESPAC").
Id.  He is trained to alert upon smelling marijuana, among other
drugs.  If called, Trooper Reid would testify that a canine is
placed in service by the Massachusetts State Police only after
the dog and its handler have successfully met the criteria
required by NESPAC, and that one of NESPAC's functions is to
establish consistent standards for canine/handler certification
for the member states (including Massachusetts).  He would also
be expected to testify that, on a weekly basis,  the canine unit
participates in a day of training (unless preempted by a call to
assist in police work), and that Mako was re-certified on an
annual basis after his initial certification in 1996.

     Since being placed in service, Mako had, at the time of the
search, participated in over 1800 searches, including both actual
searches and training exercises.  Edwards Aff. at 3, ¶1.  Over
350 times, Mako had identified the odor of narcotics.  Id.  As a

result of Mako's work, officers had seized heroin, cocaine, and marijuana. Id. Detective Edwards also reported that Mako had alerted to narcotics odor, finding currency, over 30 times. Id.

Together, Trooper Reid and Mako circled the truck. Surv. Rep. ¶17. The dog then checked the interior of the truck -- first the cab, and then the bed. Id. During Mako's check of the truck's bed, Trooper Reid smelled an orange smell, which he would be expected to testify was consistent, in his training and experience, with an effort to hide the odor of narcotics. Id. He also noticed that the weather was cold, and that the wind was blowing into the rear of the truck bed. Id.

Trooper Reid moved the things in the truck bed so that items at the rear (where the wind was blowing) would be sheltered. Id. ¶18. Mako checked the rear of the truck again, this time biting and scratching (his trained response to narcotics odor) at the FedEx boxes. Id. This reaction tore a small hole in a box, through which agents saw cash. Id. Newell was asked about the money in the box and did not answer. Id. ¶19.

At that point, Detective Edwards informed Newell that the officers would seek a search warrant for the truck, and told Newell he was free to leave. Id. At about 12:30 p.m., after giving Detective Edwards his cellphone number, Newell left the area and returned to the Holiday Inn Express. Id. ¶20. His truck was towed to DEA's garage pending application for a search

warrant.  Id.

A clerk magistrate of the Cambridge District Court signed off on the search warrant, and at about 11:30 p.m., the boxes were opened.  Id. ¶31.  Inside the two Federal Express packages, agents found approximately $218,910 in cash.  Id.  They also found plastic tarps smelling of marijuana in the rear bed of the truck, as well as the tan duffel bag that Walter had placed in the truck earlier that day.  Id.  It contained clothing, toilet articles and an additional $3,000.  Id.

## II.  Argument.

On January 24, 2003, Newell ran a red light (although he disputes this, creating a factual issue).  This traffic violation allowed police to pull him over, approach, and inquire.  See Delaware v. Prouse, 440 U.S. 648, 653, 659 (1979).  And, based on the information known to DEA, the officers involved had an articulable and reasonable suspicion that Newell was engaged in criminal activity, justifying a limited investigative Terry stop. United States v. Trueber, 238 F.2d 79, 92 (1st Cir. 2001), citing United States v. Sharpe, 470 U.S. 675, 682 (1985).

Newell was detained for a lengthy amount of time (some 2 1/4 hours), but the detention did not amount to an arrest.  See United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001).  During that time, Newell gave consent to search his truck; the truck was searched both by a police officer and by a drug-detecting dog.

These consent searches, which explicitly did not extend to the two FedEx boxes, gave rise to probable cause to search those boxes, as the dog alerted to the box.

**A.  The Stop of Newell's Truck was Reasonable, Whether Viewed as a Traffic Stop or Considering the Collective Knowledge of the Officers.**

Newell's factual claims -- that he did not run a red light, and that he was pulled over at gunpoint -- create factual disputes for this Court to resolve.  As Newell concedes, however, if he did fail to stop for a red light, the police were justified in pulling him over.  <u>See</u> Defendant Gary Newell's Motion to Suppress Evidence ("Def. Mot.")at 9, <u>citing</u> <u>Pennsylvania v. Mimms</u>, 434 U.S. 106 (1997).  And, as Newell also concedes, if the police had probable cause to conduct a valid traffic stop, the stop was proper, regardless of any ulterior motive.  <u>Whren v. United States</u>, 517 U.S. 806 (1996).  Furthermore, as described in the factual summary above, the DEA agents whom the Cambridge Police were assisting had ample reason to suspect Newell in connection with an ongoing marijuana-trafficking investigation. Thus, even absent a traffic violation, there would have been the necessary  basis for a limited investigative <u>Terry</u> stop of Newell.  <u>Trueber</u>, 238 F.2d at 92.  The officers were therefore entitled not only to stop the truck, but also to "detains its occupant[], and pursue a means of investigation that was likely to confirm or dispel their suspicions quickly."  <u>Id</u>.

10

**B.    The Stop of Newell Did Not Ripen into an Arrest.**

Newell maintains that this stop, even if initially justified, was converted by its length and by the search of his truck, into an unwarranted intrusion on his Fourth Amendment rights.  Def. Mot. at 9-10.

The length of a detention is only one of the factors a court considers when assessing the whether a Terry stop has ripened into arrest, such that Miranda warnings must be given.  See Chhien, 266 F.3d at 6; United States v. Owens, 167 F.3d 739, 748-49 (1st Cir. 1999).

As the First Circuit has recognized, "There is no scientifically precise formula that enables courts to distinguish between investigatory stops ... and ... 'de facto arrests'."  Trueber, 238 F.3d at 92, quoting United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994).  A court reviewing whether the stop rose to the level of an arrest does a two-part analysis: first, there is a factual inquiry into the circumstances surrounding the exchange between the government agent and the suspect.  Trueber, 238 F.3d at 93.  Second, a court analyzes whether a reasonable person in the defendant's position "would have believed that he was actually in police custody and being constrained to a degree associated with formal arrest[.]"  Id. (citation omitted).

The factual analysis focuses on the surroundings, the number

of officers present, the degree of physical restraint (if any) to which the defendant was subjected, and the length and character of the questioning. Id. at 93, quoting United States v. Ventura, 83 F.3d 708, 711 (1st Cir. 1996). In this case, a fair viewing of these facts shows that Newell was not subject to a degree of restraint similar to that of arrest. The surroundings, a public street, were neutral. Cf. Trueber, 238 F.3d at 94. Until the dog-handler arrived, only three officers (Detective Edwards and Cambridge Police officers David Diamond and James Ruffing) were present at the scene. See Surv. Rep. ¶11; cf. Affidavit of Gary Newell ("Newell Aff.") ¶¶5-6. And, setting aside Newell's accusation, no weapons were brandished at the scene; even by Newell's account, it appears, the officers used their guns only at the very beginning of the stop. See Newell Aff. ¶5. There was no physical imposition on Newell -- no pat-down, no search. See Newell Aff., passim; Surv. Rep., ¶¶11-19.

The final inquiry -- the length of the encounter -- is, at least at first blush, the most troublesome. Newell was, by all accounts, held by the side of the road for slightly longer than two hours. And, had there been no discussion between him and Detective Edwards during this time period, or had Newell refused his consent to search, or indicated that he intended to leave, perhaps the delay would be fatal. On the facts as outlined above, however, the delay was reasonable, and did not convert the

stop into a detention.

As described above, Detective Edwards had suspicions about Newell's activities in the Boston area even before the challenged stop.  In the early moments of the stop, those suspicions multiplied.  Newell's answers were inconsistent; his claimed reason for being in the area was not supported by the items that Detective Edwards could see through the truck's windows[1]; and Newell was acting in a way that the 17-year veteran officer thought betrayed nervousness.  Surv. Rep. ¶¶12-13.  A criminal records check, though it did not reveal any active warrant nor license suspension (which would have justified Newell's arrest), no doubt added to the detective's suspicions, as it showed a prior narcotics violation.  Surv. Rep. ¶14.

In response to these suspicions, Detective Edwards asked for permission to search the truck.  Surv. Rep. ¶15.  Although he now disputes it, Newell consented to the search.  Id.  Again, Detective Edwards' suspicions were raised rather than assuaged; when he showed particular interest in two Federal Express boxes, Newell explicitly, twice, denied his consent to search.  See id. ¶¶15-16.  These steps, like those taken by the officers at the scene in Owens, are the careful efforts of an experienced law-

---

[1]Newell wisely does not seem to argue that Detective Edwards was barred from looking through the windows of his truck.  See New York v. Class, 475 U.S. 106, 118 (1986) (no expectation of privacy in spaces that are inside car, but within plain view of those outside).

enforcement officer assessing the facts of a developing situation and acting on facts as they become apparent.  Compare Owens, 167 F.3d at 749 (noting that fifty-minute stop, while lengthy, included officers' efforts to "diligently pursue[] a means of investigation that would dispel their suspicions.").

His suspicions now focused firmly on the FedEx boxes, Detective Edwards informed Newell that he planned to call a narcotics dog to the scene.  Surv. Rep. ¶¶15-16.  Newell's response was not to protest, nor to ask to leave, nor to attempt to leave, but rather to indicate to Detective Edwards, "We're just gonna have to wait for your guy."  Id. ¶16.  Newell then waited with the officers until Trooper Reid of the State Police and his dog, Mako, arrived.[2]  Newell thus consented to wait for the narcotics dog and his handler, as he consented to the earlier search by Detective Edwards and the subsequent search of his truck by the dog.  Compare Trueber, 238 F.3d at 95-96 (remanding case to district court for determination of whether defendant was "in custody" when he accompanied two armed federal agents back to his hotel room and watched them search through his personal belongings; district court had improperly concluded that

---

[2]The report is silent as to when this happened.  Newell asserts that the dog did not arrive until "more than an hour" after the initial stop.  Newell Aff. ¶10.  The surveillance report indicates that Newell was stopped at approximately 10:15 a.m. and released at approximately 12:30 p.m.  Surv. Rep. ¶¶11, 20.  Newell's estimate is facially consistent with this timing.

defendant was in custody without assessing whether he was restrained to a degree equivalent to being under arrest).

As Trueber indicates, an encounter between a police officer and an individual can be a subtle affair.  Close proximity to a law-enforcement agent, even for a prolonged period of time, and even (as in Trueber's case) accompanied by significant constraints on liberty, does not automatically rise to the level of an arrest.  It may, instead, show voluntary participation -- that is, consent.  Cf., Chhien, 266 F.3d at 7-8 (motorist voluntarily consented to pat-down search and willingly answered question about bulge discovered during pat-down).  Here, Newell stood by voluntarily and waited with the officers for the trooper and his dog to arrive.  There is no evidence that he tried to leave, nor that he asked whether he could leave.  Under the circumstances, it cannot be said that Newell was under arrest.

The second Trueber inquiry, whether a reasonable person in Newell's position would have thought he was under arrest, leads to the same conclusion.  Newell was, as noted above, in a public place.  He was speaking primarily with a single, plainclothes police officer.  The tenor of the encounter was, by all accounts, civil.  Newell was never placed in a police cruiser or otherwise physically constrained, nor was he told that he could not leave.  Objectively, Newell cannot be said to have been under arrest.  Cf. Trueber, 238 F.3d at 95; Owens, 167 F.3d at 748-4.

**C.  The Consent Search of Newell's Truck was Proper; The Drug Dog Was Properly Trained and Certified, as Set forth in the Affidavit; The Subsequent Search Was Conducted on a Showing of Probable Cause.**

**1.  Newell Gave Consent to Search His Truck.**

After the initial discussions between Newell and Detective Edwards, the detective asked for Newell's consent to search the truck.  After receiving consent, Detective Edwards looked through the truck, focusing on the two Federal Express boxes in the truck's bed.  Newell now claims that he never gave consent.

Consent searches are among the most well-recognized exception to the Fourth Amendment warrant requirement.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  In such cases, the government must demonstrate by a preponderance of the evidence that consent to search was obtained voluntarily.  See United States v. Schaefer, 87 F.3d 562, 569 (1st Cir. 1996).  Voluntariness can either be express or implied; however, it is not necessary that a suspect know or be specifically advised that he has the right to refuse.  Schneckloth, 412 U.S. at 235-246 (voluntary consent constitutes waiver of Fourth Amendment rights and may be given unintentionally and without knowledge of right to refuse).  See also United States v. Forbes, 181 F.3d 1, 5-6 (1st Cir. 1999)(consent voluntary despite absence of advice regarding right to refuse).

In this case, where Newell denies he gave consent, an

16

evidentiary hearing will likely be necessary.  During the hearing, the Court will assess the circumstances of the stop and consent, among them "age, education, experience, intelligence, and knowledge of the right to withhold consent [. . .]  whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances."  United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993), cert. denied, 510 U.S. 850; see also, United States v. Collazo-Aponte, 216 F.3d 163, 187 (1st Cir. 2000), cert. granted in part, judgment vacated in part on other grounds (Apprendi violation), 532 U.S. 1036 (2001).

Because Newell does not admit that he gave consent, he does not address these factors.  Each of them, however, points toward a finding that the consent was voluntary.  Newell is a mature adult; he is well-traveled and educated; he has at least some (admittedly not recent) experience with law enforcement.  He was in the company of, at most, three law enforcement officers when he first gave consent.  Although Newell was not explicitly advised of his right to refuse consent, no such warning is required.  See Schneckloth, 412 U.S. at 235-246; Forbes, 181 F.3d at 5-6.  As described above, neither the obtaining of consent nor the circumstances in which Newell gave his consent was inherently coercive.

And, tellingly, even by his own account, Newell did not object at any point during the search. Instead, he apparently watched as first Detective Edwards and then Mako went through the truck.[3] A defendant's failure to object during a search is powerful evidence of consent. See, e.g., United States v. Stribling, 94 F.3d 321, 324 (7th Cir. 1996) (when defendant who consented to search of car was present during the search, she "could (and should) have protested at the time if she believed [the officer] exceeded the scope of her consent, as it was her consent to limit that scope"; in absence of objection, fruits of search not suppressed); United States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996) (defendant's failure to object when police officers looked underneath carpet in trunk of car evidence that such search did not exceed scope of his consent to search). Indeed, Newell exercised his power to object when he repeatedly denied Detective Edwards' requests to look inside the FedEx boxes.

---

[3]If the Court determines that Newell gave consent to search the interior of his truck, no different type of consent is required before the troopers can use the drug detection dog. A dog sniff is not a "search" within the ambit of the Fourth Amendment because the intrusiveness inherent in that action is minimal. See United States v. Place, 462 U.S. 696, 707 (1983). If the officers were lawfully in the truck, which the government submits they were, as they had received consent to search, then the dog was lawfully in the truck. See United States v. Esquilin, 208 F.3d 315, 318 (1st Cir. 2000) (no search when dog sniffed interior of hotel room after defendant voluntarily consented to presence of dog and officers in room).

18

The consent searches of the truck were valid, whether considered under the consent doctrine, as described above, or under the "automobile exception," as the officers at the scene, and agents working with them, had probable cause to search the truck, based on the facts known to them collectively before the stop, and developed during the stop.  See <u>California v. Acevedo</u>, 500 U.S. 565, 569 (1991).  Should the Court determine, after hearing, that Newell did <u>not</u> give his consent to search, the government respectfully requests an opportunity to develop this argument further, based on the post-hearing record.

**2.    The Drug Detection Dog Was Certified and Reliable; No Improper Search Occurred when the Packages Were <u>Moved, Nor When the Money was Revealed.</u>**

Newell contends that Mako's alert to the FedEx boxes cannot properly be the basis for a search warrant, since Mako was not reliable (or cannot be proved to be reliable).  <u>See</u> Def. Mot. 10-12; <u>Franks</u> Mot. at 7-9.  Newell also contends that, by moving items in the truck bed and allowing Mako to sniff again, Trooper Reid impermissibly violated his Fourth Amendment rights.  <u>See</u> Def. Mot. at 12; <u>Franks</u> Mot. at 5-7.  Finally, Newell argues, officers' act of looking at the hole in the box torn by Mako's tooth when he alerted constitutes in impermissible search. <u>Franks</u> Mot. at 5-7.

**a.    <u>The Dog Was Certified and Reliable.</u>**

As forth above in the Facts section, Mako was a trained

narcotics detection dog and has been certified on a yearly basis since 1996, when he was first certified.  He participated in weekly training exercises and worked at narcotics detection.

An alert by a certified narcotics detection dog is sufficient to establish probable cause to search, see United States v. Race, 529 F.2d 12, 15 (1st Cir. 1976), assuming the dog is reliable.  Owens, 167 F.3d at 749.  Mako was trained and certified at the time of the sniff, two overwhelming facts in favor of finding that he was reliable.  See, e.g., Owens, 167 F.3d at 749 (affirming District Court's conclusion that dog, who was certified at the time of the questioned stop, was reliable, despite fact that dog had failed to pass two earlier certification tests); United States v. de los Santos Ferrer, 999 F.2d 7, 10 (1st Cir. 1993), cert. denied, 510 U.S. 997 (dog alert provided sufficient probable cause for detention of person whose name appeared on luggage tags where dog is "a certified, narcotics-detecting dog" who alerted in a way that dog's handler testified was "expected response when narcotics were present"); Race, 529 F.2d at 14 (dog's behavior probative of presence of drugs where dog had undergone intensive training, had at least four hours weekly of follow-up training since then, as well as work experience; and dog's reaction during challenged search was same as past reactions to drugs); United States v. Maldonado-Espinosa, 767 F. Supp. 1176, 1188 (D. P.R. 1991), aff'd, 968 F.2d

101 (1st Cir. 1992), <u>cert. denied</u>, 507 U.S. 984 (alert by
trained, reliable narcotics dog provides probable cause to arrest
owner of luggage that prompted dog alert).  Indeed, simply
reciting that a dog is "trained" may be sufficient to allow an
inference by the Court that the dog "had attained a high degree
of proficiency in detecting the scent of narcotics."  <u>United
States v. Meyer</u>, 536 F.2d 963, 966 (1st Cir. 1976).

Here, the affidavit signed by Detective Edwards in support
of the search warrant establishes that Mako was trained and
reliable.  The information therein, as Detective Edwards reported
at the time, came from Trooper Reid, the dog's handler, who
gleaned the information from his records.  Edwards Aff. at 3, ¶1.
If called, Trooper Reid would be expected to testify that Mako
was indeed trained and reliable and that he had worked with Mako
for seven years at the time of the search.  He would also
testify, as he told Detective Edwards, that this was not the
first time Mako's narcotics-detection skills had led to money,
rather than drugs.  <u>See</u> Edwards Aff. at 3, ¶1.

Newell claims this is a fatal flaw, since Mako was not
trained in currency detection.[4]  This argument ignores well-
established facts about the relationship between cash and drug
dealing, as well as Mako's own experience, as set forth in the

_____

[4]Newell advances this argument in his Motion for a Franks
Hearing and Motion to Suppress Evidence at pp. 7-8.

Edwards Affidavit.

It is no secret that drug dealers traffic in both drugs and cash; that the cash is often near the drugs, or touched by people who have recently been touching drugs; and that cash is one of the "tools of the trade" of drug-dealing.  Courts regularly, therefore, recognize that a drug-detection dog's alert to currency is probative of drug dealing.  See, e.g., Owens, 167 F.3d at 748 (affirming admission of gun, ammunition, cash and address books found when trained narcotics-detection dog alerted to compartment in car; no drugs found); see also, United States v. $242,484, 389 F.3d 1149, 1165 (11th Cir. 2004) (citing certified narcotics-detection dog's alert to cash as one fact supporting finding that cash was narcotics proceeds); United States v. Johnson, 323 F.3d 566, (7th Cir. 2003) (citing certified narcotics-detection dog's alert to glove compartment which proved to contain cash as element of probable cause to search car; reversing district court's decision to suppress evidence); United States v. Ibarra, 345 F.3d 711, 712 (9th Cir. 2003) (describing alert by narcotics-detection dog to two areas in vehicle, one of which contained cash, but no drugs, and the other of which contained drugs, in reviewing evidence supporting finding of probable cause); United States v. $141,770, 157 G.3d 600, 604(8th Cir. 1998) (alert by narcotics-detection dog to cash one factor in finding probable cause to forfeit cash as drug

proceeds).

In this case, Mako's alert was consistent with what the DEA agents conducting the investigation believed: that Newell had driven cross-country with a truck-load of marijuana, and was now returning to the suppliers with a cash payment.  This suspicion was enhanced by some items seen in (and later seized from) the truck, including plastic tarps smelling of marijuana and the duffel bag left by suspected coconspirator Kurt Walter.  <u>See</u> Surv. Rep. ¶31.  Mako's alert, therefore, was within his competence as a certified drug-detecting dog.

### b. <u>There Was No Violation in Moving the Boxes.</u>

Newell gave consent to search his truck, as outlined above. That consent does not limit the searching officers to a visual inspection of the truck; instead, they were within their rights to touch or pick up items inside the truck.  Because officers had consent to search, the movement of the boxes from one (windy) area of the truck bed to a more sheltered area did not constitute a Fourth Amendment violation.  The same analysis applies if the officers had probable cause to search the truck.

### c. <u>The Dog's Alert Was not a "Search."</u>

When Mako sniffed the boxes, he alerted as he was trained to do when he detected narcotics odor.  As described by officers at the scene, Mako was what is known in the dog business as an "active alert" dog -- he bit and scratched at the package.

23

("Passive alert" dogs, in contrast, just sit down.)  This biting
and scratching alone was sufficient to establish probable cause
for the officers to seek and obtain a search warrant for the
package.  <u>Cf</u>. <u>Race</u>, 529 F.2d at 15; <u>Owens</u>, 167 F.3d at 749.  The
officers, however, saw what Mako had exposed, and that
contributed to their dawning conclusion that Newell was, as
suspected, involved in drug-trafficking.  Because the currency
had been exposed to view by the dog's lawful search, any sighting
of it was not improper.  And, even were such viewing something
that the officers should have avoided, it was a harmless
violation, as the currency would inevitably have been discovered
given that probable cause was established by the dog's reaction.

**III. <u>Conclusion</u>.**

Given the likelihood of an evidentiary hearing on this
motion, the government respectfully requests leave to submit an
additional brief following that hearing.  For the reasons set
forth above, as well as any developed at hearing or in post-
hearing briefing, the government respectfully submits that the
suppression motion should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ Rachel E. Hershfang
     RACHEL E. HERSHFANG
     Assistant U.S. Attorney

Dated: December 28, 2004

24