**TAB 1**

# UNITED STATES DISTRICT COURT

———————————— DISTRICT OF MASSACHUSETTS ————————————

UNITED STATES OF AMERICA

**CRIMINAL COMPLAINT**

V.

M.J. No.:

Douglas K. Bannerman,
Kurt Walter,
Gary Newell,
Daniel MacAuley,
John McCarthy,
Scott Myers,
John Graham, and
Jose Vezga

*2003 m 0454RBC*

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. In or about **January 2003 to November 2003** in **Suffolk** County and elsewhere in the District of **Massachusetts**, defendant did, (Track Statutory Language of Offense)

> **Conspiracy to possess with intent to distribute and to distribute marijuana, a Schedule I controlled substance**

in violation of Title **21** United States Code, Section **846**.

I further state that I am a(n) **Special Agent – DEA**
Official Title

and that this complaint is based on the following facts:

> **Please see attached Affidavit of Dennis Barton.**

Continued on the attached sheet and made a part hereof: [x] Yes    [ ]No

Signature of Complainant
Dennis Barton
Special Agent – DEA

Sworn to before me and subscribed in my presence,

**November 15, 2003** *at 2:41 pm* at **North Reading, Massachusetts**
Date                                                    City and State

**ROBERT B. COLLINGS**
**United States Magistrate Judge**
Name and Title of Judicial Officer

Signature of Judicial Officer

COPY

## **AFFIDAVIT OF SPECIAL AGENT DENNIS BARTON**

I, Dennis Barton, being duly sworn, hereby depose and state as follows:

1.   I am a Special Agent with the Drug Enforcement Administration.  I have served in this capacity for 19 years.  I am currently assigned to the Drug Enforcement Administration's Boston, Massachusetts resident office.  During my tenure as a Special Agent, I have worked on dozens of drug investigations.  I have written and/or participated in the execution of numerous search warrants resulting in seizures, including large quantities of controlled substances; packing implements and other paraphernalia involved in the manufacture and distribution of controlled substance; large amounts of United States currency, ledger books, bank records, telephone books, receipts, drug customer lists, and other documents relating to the manufacture, transportation, ordering, purchasing and distributing of controlled substances.  The information contained in this affidavit was either observed by me or related to me by law enforcement officers involved in this investigation.  During my law enforcement career, I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities.

2.    In addition to my training, I have had extensive
experience in the investigation of the activities of narcotics
traffickers.  Since joining the DEA, I have participated in
numerous narcotics investigations as a case agent and in a
supporting role.  I have debriefed more than 200 defendants,
informants, and witnesses who had personal knowledge about
narcotics trafficking activities and the operation of narcotics
trafficking organizations.  I personally have participated in all
aspects of narcotics trafficking investigations, including
conducting surveillance, using confidential informants, acting in
an undercover capacity, and conducting court-authorized
interceptions of wire and electronic communications.  During my
law enforcement career, I have also participated in the
preparation and/or execution of numerous search warrants.

3.    Based upon my training and experience, I am familiar
with narcotics traffickers' methods of operation, including the
distribution, storage, and transportation of narcotics and the
collection of money that constitutes the proceeds of narcotics
trafficking activities.  Specifically, I am familiar with the
manner in which narcotics traffickers use vehicles, common
carriers, mail and private delivery services, and a variety of
other means to transport and distribute narcotics and the
proceeds of narcotics trafficking.  I also am familiar with the
manner in which narcotics traffickers use telephones, coded or

-2-

cryptic language or slang in telephone conversations and

voicemail messages, and other means to facilitate their illegal

activities.

4.    I have been the co-case agent (along with DEA Special

Agent Brian Tomasetta) in the investigation described in detail

below.  During my work on this investigation, I have interviewed

witnesses and cooperating individuals about their knowledge of

the matters described below.  In addition, I and other agents

working on this investigation have thoroughly debriefed

confidential informants and cooperating witnesses concerning

their knowledge of the narcotics-trafficking activities discussed

below.  I have also reviewed reports prepared by agents regarding

other witness interviews, and discussed this case with agents and

local law enforcement officers who have been involved in this

investigation.  I have reviewed draft transcripts of telephone

calls intercepted pursuant to orders allowing such interceptions

under Title III, have listened to many of those calls, and have

spoken with other agents and local law enforcement officers who

have been monitoring such calls. As a result of my personal

participation in this investigation, through my conversations

with other agents and officer, and my analysis of reports

prepared by other agents, I am familiar with all aspects of this

investigation.  I submit this affidavit based upon my personal

knowledge derived from my participation in this investigation and

-3-

upon information that I have received from a variety of other
sources, including other law enforcement officers and agents,
public records, telephone toll records, electronic surveillance,
and pen register and trap and trace information.

     5.    I am submitting this affidavit in support of the
government's request for the issuance of search warrants for the
following locations (collectively, the "Target Locations"):

    (a)    residence at The Windgate House, 30 Gardner Road,
Apartment 2C, Brookline, Massachusetts (the "30 Gardner
Road Residence"). This location is the current
residence of KURT WALTER and is further described in
Attachment A-1, attached hereto and incorporated
herein. The items to be seized from this location are
described in Attachment A-2, attached hereto and
incorporated herein.

    (b)    The residence at 25 Royal Road, Brookline,
Massachusetts. This location was the residence of KURT
WALTER's mother who died in May 2003 (the "25 Royal
Road Residence"). As explained further below, KURT
WALTER has used this location as a location for storing
marijuana. This location is further described in
Attachment B-1, attached hereto and incorporated
herein. The items to be seized from this location are
described in Attachment B-2, attached hereto and
incorporated herein.

    (c)    1 Watson Place, Building No. 4, storage room (no number
or other identifiers) ("the Watson Place Storage
Unit"). As explained further below, KURT WALTER is
using or is planning to use this location for storing
marijuana. This location is further described in
Attachment C-1, attached hereto and incorporated
herein. The items to be seized from this location are
described in Attachment C-2, attached hereto and
incorporated herein.

    (d)    The Fairfield Luxury Apartments, 790 Boylston Street,
Apartment 17E, Boston, Massachusetts ("the Boylston
Street Residence"). This is one of the current
residences of Douglas BANNERMAN. This location is

-4-

further described in Attachment D-1, attached hereto and incorporated herein.   The items to be seized from this location are described in Attachment D-2, attached hereto and incorporated herein.

(e)   23 Pilgrim Byway, Duxbury, Massachusetts ("the Duxbury Property").   This is one of the current residences of Douglas BANNERMAN. This location is further described in Attachment E-1, attached hereto and incorporated herein.   The items to be seized from this location are described in Attachment E-2, attached hereto and incorporated herein.

(f)   34 Bolton Street, Newton, Massachusetts.   This is the residence of Karen Woo, Douglas BANNERMAN's girlfriend ("Woo Residence").   This location is further described in Attachment F-1, attached hereto and incorporated herein.   The items to be seized from this location are described in Attachment F-2, attached hereto and incorporated herein.

(g)   16 Roach Street, Quincy, Massachusetts ("16 Roach Street Residence").   As discussed further below, this location is the residence of Daniel MACAULEY.   Also as discussed further below, MACAULEY, a regular marijuana customer of WALTER'S who has delivered drug proceeds and/or received quantities of marijuana from WALTER. This location is described in Attachment G-1, attached hereto and incorporated herein.   The items to be seized from this location are described in Attachment G-2, attached hereto and incorporated herein.

6.   I am also submitting this affidavit in support of a criminal complaint charging Douglas BANNERMAN (DOB: 5/15/58), Kurt WALTER (DOB: 5/9/65) (a/k/a "Cort"), Gary NEWELL (DOB: 7/6/51), Daniel MACAULEY (DOB: 4/7/66), JOHN MCCARTHY (DOB: 11/11/64), JOHN GRAHAM (DOB: 4/9/61) (a/k/a "JG" or "G-Man"), Scott MYERS (DOB: 2/19/68) and Jose VEZGA (DOB: 2/17/58) (collectively, the "Targets") and others known and unknown to the government, did knowingly and intentionally conspire, combine,

-5-

and agree to possess with intent to distribute and to distribute
marijuana, in violation of 21 U.S.C. §846.  As more fully
described hereinafter, I believe that the Targets are members of
a marijuana trafficking organization.  I believe that BANNERMAN
was the source of supply of marijuana to WALTER and that WALTER
in turn distributed marijuana to the other Targets who further
distributed it.

7.    I also submit for the reasons set forth hereinafter
that there is probable cause to believe that evidence of the
above-referenced drug-trafficking offense will be contained
within the Target Locations.  I believe that evidence regarding
the involvement of the Targets in the marijuana trafficking
organization will be found at the Target Locations.  I also
believe that evidence of the use, control and dominion of the
Target Locations by the targets will also be found at these
locations.

8.    This affidavit is being submitted for the limited
purpose of establishing probable cause to believe that the
Targets have committed the above-described drug offense and
establishing that evidence of the offense will be located in the
Target Locations.  Accordingly, I have not included each and
every fact known to myself and other law enforcement officers
involved in this investigation.  I have set forth only the facts
that I believe are needed to establish the requisite probable

-6-

cause for the complaint against the Targets and the search

warrants for the Target Locations.

**BACKGROUND**

## 1. Investigation Begins

9. Since September of 2001, I have participated in an

investigation of a group of individuals engaged in drug

trafficking and money laundering activities. I am familiar with

all aspects of the investigation as a result of my personal

participation in the investigation and my discussions with and

review of reports by other law enforcement officers involved with

the investigation.

**Douglas BANNERMAN**

10. BANNERMAN is the owner of record of a large, isolated

property at 23 Pilgrims Byway, Duxbury, Massachusetts. According

to the Postal Service, BANNERMAN also receives mail at 790

Boylston Street, Apartment 17E, Boston, Massachusetts. In or

about October, 2002, cooperating witness #2 ("CW-2")[1] began to

---

[1]CW-2 was a member of a conspiracy that distributed large
quantities of marijuana and cocaine throughout the United States.
CW-2 has previously been convicted in 1991 of possession or
purchase for sale of narcotics in Santa Barbara and in 1995 for a
misdemeanor offense of petty theft. CW-2 agreed to cooperate
after it was intercepted engaging in numerous drug-related
conversations with Ivan Moreno-Fernandez ("Moreno-Ferandez") in
connection with a DEA San Diego, California wiretap investigation
and after a small quantity of illegal drugs was found in its
possession. It has not been charged in connection with that
seizure.

-7-

provide information to DEA about BANNERMAN and others regarding their involvement in marijuana trafficking.

11. Specifically, CW-2 told DEA the following: CW-2 first met BANNERMAN toward the end of 1998 in Boston, Massachusetts. In the summer of 2000, CW-2 and an associate named Ferin Martin, a/k/a "Mustard," drove to Tucson, Arizona to purchase 800 pounds of marijuana for BANNERMAN. They bought 150 pounds of marijuana from a source and drove it to San Diego. BANNERMAN rejected the marijuana because of its poor quality.

12. According to CW-2, between October 2001 and about March 2002, BANNERMAN bought several loads of marijuana from Moreno-Fernandez, brokered by CW-2. According to CW-2, BANNERMAN was not present for the delivery of drugs or money by the marijuana suppliers; instead, the loads of marijuana were delivered cross-country by couriers in trucks that could hold over 850 pounds of marijuana. The first load, 850 pounds, was sold to BANNERMAN and Gary MILO ("MILO"); BANNERMAN paid a total of $500,000 for the load. The second load purchased by BANNERMAN was 495 pounds. The third load was 1200 pounds and part of the payment was delivered by MILO. The fourth load was 495 pounds and BANNERMAN purchased this load. The fifth load was 500 pounds purchased by MILO. The sixth load was 495 pounds, purchased by BANNERMAN and an unidentified man known to CW-2 as "Jim."

-8-

13.  In the summer and fall of 2002, CW-2 engaged in a
number of consensually recorded telephone calls and controlled
meetings (that were surveilled by law enforcement) with Moreno-
Fernandez, CW-2's and BANNERMAN's marijuana source, regarding the
purchase of marijuana.  Although they had concrete discussions
about quantity and timing for a marijuana deal, no transaction
materialized.

14.  During the same time-frame, Moreno-Fernandez told CW-2
that he had not been in contact with BANNERMAN recently, and that
BANNERMAN did not have his number.  However, telephone toll
analysis shows twenty-nine calls from a telephone used by Moreno-
Fernandez into BANNERMAN's former voicemail box[2] between July 10,
2002 and January 8, 2003.  In combination with Moreno-Fernandez'
failure to consummate a marijuana deal with CW-2, I believe this
indicates that Moreno-Fernandez suspected CW-2 of cooperating or
that he was attempting to cut CW-2 out as the middleman and deal
directly with BANNERMAN.

15.  Analysis of toll records and pen register data related
to BANNERMAN revealed that BANNERMAN, via his former voicemail
box, was in touch with Gary NEWELL during his cross-country trip

---

[2]CW-2 told DEA that BANNERMAN communicated by means of
voicemail boxes; our investigation bore this out, most tellingly
through the seizure of over $220,000 from Gary NEWELL, as
described in the next section.  During the time period described
in text (July 2002-January 2003), BANNERMAN was using a voicemail
box with a telephone number of (617) 499-1990 (hereinafter,
BANNERMAN's "former voicemail box").

to Massachusetts in January 2003 that culminated in the seizure
of $221,910.00 from him in suspected drug proceeds.

## 2. Seizure of Drug Proceeds from Gary NEWELL--January 2003

### GARY NEWELL

16. According to his driver's license, NEWELL currently
resides at 34637 Devonshire Drive, Eugene, Oregon. On January 24,
2003, agents seized $221,910.00 in suspected drug proceeds from
Gary NEWELL, who drove from the west coast to Massachusetts in a
truck capable of holding a large quantity of marijuana. Based on
the investigation described below, I believe that NEWELL drove a
load of marijuana cross-country and delivered it to BANNERMAN,
whose customers had been calling BANNERMAN and were waiting for
the drugs.

17. En route to Massachusetts, NEWELL placed a number of
calls to BANNERMAN's former voicemail box. Analysis of trap and
trace data and telephone toll records revealed that calls were
placed to BANNERMAN's former voicemail box, between January 20,
2003 and January 22, 2003, from a telephone located at a Holiday
Inn West in Lakewood, Colorado (where, later determined through
hotel records, NEWELL, with a Ford truck with Oregon plates, was
registered to stay on January 20, 2003); from a telephone in
Boonville, Missouri; and from one telephone in Medina, Ohio. The
three locations from which these calls were made are located

-10-

along a route that one could drive from Southern California to Massachusetts.

18.   During the days leading up to the January 24th money seizure from NEWELL, telephones associated with other Targets were in touch with BANNERMAN.  For example, there were calls placed through a prepaid calling card believed to be used by BANNERMAN.  These calls included three calls on January 21, 2003 to (617) 901-0104, a telephone subscribed to by WALTER.

19.   Based upon analysis of pen register data on the morning of January 24, 2003, DEA decided to initiate surveillance in the vicinity of the Holiday Inn Express in Cambridge that day, believing that NEWELL might stay there.  At approximately 9:15 a.m., a DEA agent saw a Ford F-150 pick-up truck with Oregon plates parked in the front parking lot of the Holiday Inn Express.  At approximately 9:25 a.m., agents saw a male subsequently identified as NEWELL seated in the truck.  From this location, agents followed NEWELL in the truck to the Lechmere Auto Wash, located at 262 Monsignor O'Brien Highway.

20.   There, agents saw a male, subsequently identified as WALTER, exit a white BMW 540i sedan, Massachusetts registration 916-VXG (registered to Kurt WALTER, 25 Royal Road, Brookline, MA) ("WALTER'S BMW") and walk over to speak with NEWELL outside the Ford truck.  NEWELL then drove the Ford truck into a self-serve

-11-

car wash bay and washed the truck while WALTER walked back and
forth several times between WALTER'S BMW and the truck.

21.  At approximately 9:59 a.m., agents saw WALTER take a
tan-colored duffel type bag from WALTER'S BMW and place it in the
front passenger side of the Ford pick-up. Agents later saw NEWELL
take this bag and place it into the enclosed bed of the Ford
truck.  At approximately 10:00 a.m., agents saw WALTER exit the
parking lot in WALTER'S BMW.

22.  At approximately 10:05 a.m., agents saw another male
approach the Ford truck and place something in the rear bed of
the truck.  This male departed in a black colored Ford Explorer
LTD.

23.  At approximately 10:10 a.m., agents saw NEWELL's Ford
truck exit the car wash location; with the help of local police,
NEWELL's truck was stopped.  The driver produced a license and
registration in the name of Gary Dean NEWELL, 34637 Devonshire
Drive, Eugene, Oregon.  A search warrant was obtained for two
Federal Express packages in his truck and NEWELL was allowed to
leave.  NEWELL walked back to and entered the Holiday Inn
Express.

24.  Inside the two Federal Express packages, agents found
approximately $218,910 in cash.  They also found plastic tarps in
the rear bed of the truck which smelled of marijuana.  They also
found the tan duffel bag that WALTER had placed in the truck

-12-

earlier that day.  It contained clothing, toilet articles and an additional $3,000.

25.  A DEA forensic chemist conducted a vacuum search of NEWELL's truck.  The material that was collected was sent to the DEA Laboratory for analysis and it has tested positive for the presence of marijuana.

26.  Later, approximately thirty minutes after the truck was towed away and NEWELL was seen returning to the Holiday Inn Express, a call was placed to BANNERMAN's former voicemail box from a pay telephone located at the Osco Drug Store at 14 McGrath Highway, near the Holiday Inn Express where NEWELL had stayed the previous night.

27.  I believe that NEWELL drove a load of marijuana across country; that the load belonged to BANNERMAN; that NEWELL called BANNERMAN's former voicemail box at various points during his trip to advise BANNERMAN of his progress; that BANNERMAN in turn contacted several other Targets to organize the collection of drug monies; that NEWELL delivered the marijuana prior to the discovery of his whereabouts on the morning of January 24, 2003; that the $221,910.00 seized inside the truck constituted partial payment for the marijuana; that some of the seized money was WALTER's; and that the call to BANNERMAN's former voicemail box from the Osco Drug Store pay telephone was placed by NEWELL for the purpose of advising BANNERMAN of the money seizure.  Based on

-13-

information I have learned during the course of this
investigation, and based on my training and experience in
marijuana investigations, I believe this money represents
approximately 276-315 pounds of marijuana.  I reach this estimate
by using a price of $700-$800 per pound, which I believe to be an
accurate wholesale rate for marijuana in this geographic location
at this time.

### KURT WALTER

28.  WALTER was the individual who delivered a duffel bag to
Gary D. NEWELL, a suspected marijuana transporter and money
courier, shortly before $221,910.00 in U.S. currency was seized
from NEWELL on January 24, 2003.[3]  Beginning a few months later,
in May 2003, cooperating witness #1 ("CW-1")[4] reported to DEA

---

[3]After this meeting, surveillance agents followed WALTER in
WALTER'S BMW to Brookline, where it was spotted parked in the
area of the 25 Royal Road Residence (the address on WALTER's
driver's license and vehicle registration).  Approximately 15
minutes later, WALTER exited the 25 Royal Road Residence and was
followed to the 30 Gardner Road Residence, where WALTER parked in
front.  (A phone subscribed in WALTER's name comes back to this
address.)

[4]CW-1 came to the attention of the Boston Field Office of
DEA as a result of a multi-state, wiretap investigation, led by
the DEA Medford Resident Office in Medford, Oregon, that targeted
a marijuana trafficking organization.  In the course of a wiretap
on telephones used by CW-1's cousin in December 2002 and January
2003, several calls between CW-1 and its cousin were intercepted.
During the execution of a search warrant on CW-1's residence in
May 2003,  agents seized various documents and items (including
but not limited to an electronic scale, baggies, pipe and a small
quantity of marijuana) relating to drug trafficking and CW-1's
occupancy there.  CW-1 has not yet been charged in connection
with the marijuana trafficking conspiracy in Oregon or elsewhere.

-14-

that beginning in September 2001, CW-1 would supply WALTER with
marijuana every six weeks or so.  CW-1 gave quantities of
marijuana to WALTER that ranged from twenty-five to fifty-pound
quantities.  CW-1 estimated that it supplied WALTER on another
eight occasions after their first September 2001 deal in which
CW-1 supplied WALTER with twenty-five pounds of marijuana.  In or
about January 2003, CW-1 lost its source of supply for marijuana.
In or about February 2003, CW-1 agreed to be supplied by WALTER,
and WALTER "fronted" (i.e., gave without immediate payment) sixty
pounds of poor quality marijuana to CW-1.  CW-1 had difficulty
selling much of this marijuana because of its poor quality, but
WALTER was reluctant to take it back.  CW-1 told WALTER of one
customer who could take twenty-five pounds, but he was slow to
pay.  WALTER agreed that CW-1 should take the chance and give it

---

However, based upon conversations between the U.S. Attorney's
Office in Boston and the U.S. Attorney's Office in the District
of Oregon, I understand that CW-1 will likely be charged in
participation in a conspiracy to distribute marijuana in
violation of Title 21, United States Code, Section 846 in the
District of Oregon.  I also understand that its cooperation in
connection with the Massachusetts investigation will be
considered in connection with the government's recommendation for
disposition in the District of Oregon matter.  I also understand
that there are currently no plans to charge CW-1 with separate
charges in the District of Massachusetts.  CW-1 has previously
been convicted in 1987 for two counts of distribution of a Class
D controlled substance (marijuana) and conspiracy to violate the
Controlled Substances Act.  CW-1 also was convicted in 1989 in
Framingham District Court for possession of marijuana with intent
to distribute and distribution of a Class D substance (marijuana)
and possession with intent to distribute a Class B controlled
substance (cocaine) and conspiracy to violate the Controlled
Substances Act.

-15-

to this customer, Mohamed Ash-Fouad (a/k/a "The Egyptian" or "Alex") on consignment.

29.  CW-1 told DEA that in or about February 2003, CW-1 gave eighteen pounds[5] of the marijuana from WALTER to Ash-Fouad on consignment. Ash-Fouad owed CW-1 $26,500 for this marijuana. Subsequently, during various meetings and telephone conversations, Ash-Fouad refused to pay CW-1 for the marijuana. Eventually, WALTER began to pressure CW-1 for the money that Ash-Fouad owed for the marijuana. CW-1 told WALTER that it was turning the debt collection matter over to WALTER. To this end and at WALTER's direction (before CW-1 began cooperating with DEA), CW-1 subsequently took photographs of Ash-Fouad, his house in Wayland, and his car and gave them to WALTER. CW-1 also gave WALTER the key to Ash-Fouad's black BMW that Ash-Fouad had previously left at CW-1's residence.

30.  After CW-1 had handed the Ash-Fouad money collection matter over to WALTER, a male who identified himself only as "Scott" called CW-1. "Scott" said that he was a friend of WALTER's. CW-1 gave all the information that it had on Ash-Fouad to "Scott." "Scott" instructed CW-1 that it should not contact Ash-Fouad anymore about the money owed and·said that the matter

---

[5]CW-1 initially informed agents that the transaction was for twenty-five pounds, but later amended this to eighteen.

was not in CW-1's hands any longer.  As discussed further below,
I believe that "Scott" is Scott MYERS.

   31.  CW-1 and WALTER continued to deal in marijuana, despite
CW-1's ongoing marijuana debt to WALTER.

   32.  Beginning in May 2003 and continuing through November
2003, CW-1 had numerous consensually monitored calls  and
controlled meetings with WALTER, that were monitored by DEA
and/or recorded, for the purposes of discussing marijuana
transactions and related business, CW-1 delivering drug proceeds
to WALTER and/or WALTER delivering marijuana (or samples thereof)
to WALTER.  For these calls and for the purposes of arranging
their meetings, CW-1 and WALTER communicated via WALTER's
wireless telephone, (617) 901-0104.[6]  During the course of
several conversations, WALTER and CW-1 used various code words or
cryptic language to communicate about marijuana transactions.
For example, the two would refer to "paperwork" (meaning
collecting drug proceeds); WALTER made reference to needing "the
extra" (meaning money toward CW-1's outstanding debt on past
quantities of marijuana) from CW-1; they referred to "schedule"

_____

   [6]On several occasions, CW-1 contacted WALTER via another
wireless telephone, (857) 265-5956, a pre-paid wireless telephone
subscribed to in the name of Jason Payne, 27 University Road,
Brookline.  WALTER instructed CW-1 to call him on WALTER's second
wireless telephone, but at times the phone was not on and CW-1
would still call Target Telephone 1 to discuss marijuana
transactions with WALTER since WALTER had provided this telephone
number as another means of contacting him.

-17-

(for amount of marijuana); they used references to "hours" for quantities of marijuana (e.g., "about five hours" on that "project" meant five pounds of marijuana).

33.  CW-1 and WALTER's calls led to two meetings in May 2003.  The first of these meetings was on May 22nd; the second on May 28th.  In the first meeting, WALTER gave marijuana to CW-1 and CW-1 made a partial payment for it; in the second, CW-1 completed the payment.  Both meetings took place at CW-1's residence and were monitored and recorded  (via audio and video equipment)[7] by law enforcement agents and officers.[8]

34.  During the May 22nd meeting, upon entering the residence, WALTER deposited on a chair a package that later was determined to be approximately five pounds of marijuana).   CW-1 told WALTER that CW-1 was making only a partial payment, handed WALTER $6500 (that DEA had provided to CW-1) in a white envelope. WALTER placed this money in his coat pocket; the two then discussed when the rest of the money would be paid, and agreed on Friday (5-23-03) or Tuesday (5-27-03).

---

[7]Due to a technical malfunction, the equipment used during the May 22nd meeting recorded only the audio, not the video, of the meeting.  The agents, however, were still able to monitor the meeting contemporaneously via audio and video equipment.

[8]Unless otherwise noted, the descriptions of these meetings are based upon my contemporaneous viewing of and listening to the meeting between CW-1 and WALTER via the audio/video monitor, a debriefing of CW-1 (immediately) after the meeting with WALTER and my review of the recordings of the meeting.

35. WALTER told CW-1 that he needed the information about "the Egyptian" (meaning Mohamed Ash-Fouad), the person who owed CW-1 for WALTER's marijuana. CW-1 provided WALTER with Ash-Fouad's address and the name and address of his pizza shop. WALTER told CW-1 that he was going to send somebody by there. WALTER asked for Ash-Fouad's name and wrote it down when CW-1 provided it. Soon after his departure from the meeting, WALTER was seen entering the parking garage at the 30 Gardner Road Residence.

36. WALTER and CW-1 met again on May 28, 2003 so that CW-1 could pay the remaining $3,000 owed for the marijuana. At approximately 12:20 p.m.,[9] WALTER arrived in WALTER'S BMW and entered CW-1's residence. CW-1 passed WALTER a white envelope (containing $3000). WALTER took the envelope and put it in his back pocket without counting it. WALTER said he needed to raise "50 grand" in a week because he was buying a Chinese restaurant in Newton Centre named Sally Ling's. Later in this meeting, WALTER asked CW-1 if it could come up with any "extra" (money) because he was "scrambling" (to scrape together money for the restaurant). WALTER said he had "25" (meaning $25,000), but he had to come up with another "25" (meaning another $25,000).

37. During this meeting, WALTER also further explained the actions that he was planning to take to collect the outstanding

---

[9]All times are approximate.

-19-

drug debt from Ash-Fouad. WALTER said that he didn't know what the guys were going to do (to retrieve the money), but, at this point, WALTER didn't care. CW-1 told WALTER that it was concerned about what they are going to do because "that's going to come back on me" (meaning that any harm that came to Ash-Fouad would be tracked back to it because of the outstanding debt). (We had instructed CW-1 to say this to WALTER in an attempt to dissuade him from taking any violent action against Ash-Fouad and to gather more information about WALTER's intentions toward Ash-Fouad).[10] WALTER replied that they won't do him in; "he's just going to get pushed really hard."

38. Shortly after the meeting, a surveillance agent saw WALTER'S BMW enter the 30 Gardner Street garage complex.

39. On June 12, 2003, CW-1 met again with WALTER, but this time at the Barnes & Noble Bookstore on Route 9 near the Chestnut Hill mall.[11] During this meeting, WALTER gave CW-1 a single Marlboro Lights hard pack. (The contents were later examined and

---

[10]I note that DEA has taken steps to advise Ash-Fouad of the potential threat against him without disclosing the basis of this knowledge (i.e., CW-1's cooperation or the existence of DEA's ongoing investigation). DEA, through CW-1, has made continuing efforts to contact Ash-Fouad directly about this matter.

[11]This meeting was monitored and recorded by law enforcement agents. The following summary is based on the observations of the surveillance agents including those who were contemporaneously monitoring the conversation via the transmitter receiver, a debriefing with CW-1 immediately after the meeting and my review of the audiotape of its conversation with WALTER.

field-tested and determined to contain a sample of a new kind of
commercial grade marijuana). WALTER also indicated in this
meeting that he had hydroponic marijuana available. The price
for this type of marijuana was "36 to 38" ($3600 to $3800 per
pound) and could be sold for "42" ($4200 per pound). (Based upon
my training and experience, hydroponic marijuana is a type of
marijuana that is grown indoors using hydroponic soil and
artificial ultraviolet lighting. This type of marijuana has a
dramatically higher tetrahydrocannabinol ("THC") level than
marijuana grown outdoors and is therefore more desirable among
·users. It also is more profitable for traffickers to sell this
type of marijuana). WALTER further said that the hydroponic
marijuana could only be sold in twenty-five pound quantities and
he wondered if CW-1 had customers who would want that much. CW-1
said that it would need to get a commitment from a buyer first
and that the buyer would want to see every unit first. WALTER
said he could give CW-1 a half or a "Z" (ounce) so its buyers
could see it in bulk form. CW-1 slid the envelope with the $3500
under a book on the table and WALTER took it without counting the
money. This money represented a payment for CW-1's ongoing
marijuana debt to WALTER. WALTER asked if it would be able to
"give something on the tab" (meaning additional money toward its
debt owed to WALTER from previous amounts of marijuana that

-21-

WALTER provided to CW-1 on consignment).  CW-1 indicated that it would.

40.   In this conversation, WALTER again talked about a large money seizure (believed to be the January 24, 2003 seizure of cash from NEWELL) and said that he and his associates have had no further contact with the driver, who was from Oregon [NEWELL has an Oregon driver's license], and would not pursue trying to get the money back.  He also talked about his ongoing efforts to get enough money for his restaurant business.  He also talked about getting his money from Ash-Fouad.

41.   After CW-1 left the meeting, surveillance agents followed WALTER'S BMW back to Brookline and a short time later, surveillance saw WALTER'S BMW parked in the garage at the 30 Gardner Road Residence.

## THE WIRETAPS

42.   Based upon information summarized above and other evidence gathered in the course of DEA's investigation, this Court granted interception of wire communications via two telephones used by WALTER (including the telephone that he had used to communicate with CW-1 about marijuana transactions) and two telephones used by BANNERMAN.  Interception of communications began on Target Telephone 1 (wireless telephone number (617) 901-0104 subscribed to in the name of Kurt WALTER at the 25 Royal Road Residence) on July 21, 2003; on Target Telephone 2 (a

-22-

Verizon-New England hardline telephone number (617) 277-4117
subscribed to by Kurt WALTER at the 30 Gardner Road Residence);
Target Telephone 3 (a Sprint wireless telephone number (617) 970-
8308 subscribed to by Karen Woo, 60 Lawton Street, Brookline,
Massachusetts and used by Douglas K. BANNERMAN) on August 15,
2003; and on Target Telephone 4 (a Verizon Wireless prepaid
telephone number assigned to (617) 721-1998 subscribed to in the
name of Sarah Smith, 280 Commonwealth Ave., Boston, Massachusetts
and used by Douglas BANNERMAN) on October 10, 2003, respectively
and have continued to the present.  Throughout this Affidavit,
Target Telephone 1, Target Telephone 2, Target Telephone 3 and
Target Telephone 4 shall be referred to collectively as "the
Target Telephones."

    43.  The interceptions of the Target Telephones (and
surveillance and phone record analysis conducted in conjunction
with many interceptions) revealed, among other things, that
BANNERMAN is WALTER's source of supply for marijuana; WALTER
distributes marijuana to numerous customers including but not
limited to MACAULEY, MCCARTHY, GRAHAM and VEZGA in quantities
that are consistent with distribution, not personal use,
quantities; WALTER had engaged MYERS to collect the outstanding
marijuana debt of $26,500 from Ash-Fouad and also provided
marijuana and cash to him; WALTER delivered marijuana and
received drug proceeds to/from customers at the 30 Gardner Road

-23-

Residence; WALTER stored marijuana at the 25 Royal Road Residence and had begun to make arrangements for storing marijuana at the Watson Place Storage Unit; VEZGA had assisted WALTER in moving a large storage box for marijuana to the Watson Place Storage Unit; BANNERMAN has returned to the Boylston Street Residence after receiving drug proceeds from WALTER on several occasions and, on at least one occasion, provided marijuana to WALTER from this location.  Recent interceptions also reveal, based on my review of the calls, my familiarity with the investigation, and my training and experience, that BANNERMAN is expecting a load of marijuana shortly and recent communications with an associate, Henry Hart Johnson and others indicated that the load would likely be at the Duxbury residence and that BANNERMAN has shared information about the likely timing of the load with WALTER who has in turn passed this information to a number of his customers.

## 1. BANNERMAN identified as WALTER's Source of Supply

44.    WALTER's communications with BANNERMAN were revealed almost as soon as the interception of Target Telephone 1 began. As the following selected calls show, WALTER and BANNERMAN were in frequent contact, discussing what I believe to be the exchange of marijuana (from BANNERMAN to WALTER) for money (delivered at various times by WALTER to BANNERMAN).   The excerpts below are

merely examples, and are not meant to (and do not) exhaust the calls intercepted on the wiretaps.[12]

45.   On July 26, 2003 at 4:26 p.m., WALTER (who had returned from a fishing trip earlier in the afternoon) explained that he just had "to get everything in order" (meaning gather his drug proceeds for BANNERMAN together) and he'd be down.  BANNERMAN suggested a meeting place, and WALTER stated (in that call and a later call) that he needed time to put things in order.  At approximately 4:55 p.m., surveillance units saw the 1999 BMW Convertible that WALTER was using ("the 1999 BMW Convertible"),[13] driven by WALTER, alone, leave the garage at 30 Gardner Road. After WALTER took a series of quick turns and accelerated sharply, the agents lost the 1999 BMW Convertible in the area of Stanton and Cypress Streets in Brookline at approximately 4:56 p.m.  At approximately 5:29 p.m., a surveillance agent saw a light-colored Nissan Maxima (registered to Nancy Effros) in the driveway of the 25 Royal Road Residence.  BANNERMAN is known to drive a Nissan Maxima registered to Nancy Effros.  The 1999 BMW Convertible was in the carport.  WALTER was walking toward his vehicle.  The agent believed WALTER saw him, so surveillance

---

[12]This is true for all calls excerpted throughout this Affidavit.

[13]This car was loaned to WALTER by VEZGA, a mechanic, who was working on WALTER'S BMW.  WALTER continues to use the 1999 BMW Convertible.

-25-

suspended; a short time later, en route to 25 Royal Road, another
agent saw the same Nissan Maxima now parked in front of the 30
Gardner Road Residence.  At approximately 5:37 p.m., this agent
saw a man, later identified as  BANNERMAN, exit the 30 Gardner
Road Residence with a plastic bag in his hand.  The bag hugged
its contents so that the contents' contour was visible; it
appeared to the agent who observed it to be rectangular and
approximately the size of a large stack of U.S. currency.  The
agent saw him reach into the driver's side of the Maxima, then
walk to the trunk and place the bag in the trunk.

46.  Based upon the intercepted calls between WALTER and
BANNERMAN and the surveillance on July 26, 2003, I believe that
WALTER was arranging to deliver proceeds to BANNERMAN for past
quantities of marijuana or future purchase of marijuana; that
BANNERMAN needed to receive this money before Sunday; and that
the delivery was made by WALTER to BANNERMAN on the afternoon of
July 26th (a Saturday).

47.  Throughout the continued interception of the Target
Telephones, WALTER and BANNERMAN discussed marijuana
transactions, albeit in coded language, and made arrangements to
meet regarding same.  For example, over Target Telephone 1 on
August 5, 2003, after explaining that he was at the restaurant
(meaning Sally Ling's), WALTER told BANNERMAN  that he had "some

-26-

reports I want to go over with you" (likely meaning that he has
drug proceeds for BANNERMAN).

48.    On August 18, 2003 at 11:11 p.m., WALTER called
BANNERMAN.    WALTER told BANNERMAN that he needed to see him in a
few days.    WALTER also asked, "What's the halves?   Anything?"
WALTER asked if BANNERMAN had "any word?"   When BANNERMAN said
no, WALTER replied that was "disturbing."   WALTER further said
that "maybe we'll have to do some gardening, do some raking,...
you know."   BANNERMAN agreed and made reference to the
"landscaping thing."   WALTER agreed, but that "we're gonna have
to do a lot of landscaping."   The references to "gardening,"
"raking" and "landscaping" are likely references to marijuana and
their need to get a supply of marijuana.   The "halves" is likely
a reference to an (as-yet undetermined) quantity of marijuana.

49.    On August 26, 2003, WALTER called BANNERMAN.   During
this conversation, in coded language, BANNERMAN appeared to be
asking WALTER to take some lower grade marijuana that he wanted
to get rid of before his trip out to California.   BANNERMAN later
traveled to California. BANNERMAN was looking to meet with WALTER
that night or the next day. WALTER attempted to explain that he
had no place to put it (meaning he had no secure place to store
the marijuana). (Based upon other intercepted calls, I believe
that WALTER was worried about storing any additional marijuana
because he and his family were in the process of cleaning out his

-27-

late mother's residence, the 25 Royal Road Residence, and that is the place that he had primarily been using as a stash house). BANNERMAN asked WALTER to think about it.

50.   The following day (August 27, 2003), at 2:47 p.m., BANNERMAN, calling on Target Telephone 3, left a message for WALTER on Target Telephone 1 indicating that he would swing by and see WALTER at the restaurant. Later that day, BANNERMAN via Target Telephone 3 and WALTER spoke live. BANNERMAN indicated that he was at WALTER's restaurant and wanted to meet WALTER there. WALTER reported that he "had to go pick up some reports" and "get these reports done (meaning collecting drug proceeds from his marijuana customers) cause I wanted to go over them with you, because I, I'd like to, ya know just get them out of, out of the way and out of my hands" (meaning that WALTER wanted to collect the drug proceeds and get them to BANNERMAN). BANNERMAN indicated that he understood. WALTER explained that he should be back in an hour. Later, the two agreed to meet at the 30 Gardner Road Residence. At approximately 5:41 p.m., a surveillance agent saw BANNERMAN empty-handed, enter the 30 Gardner Road Residence. At approximately 7:08 p.m., a surveillance agent saw both BANNERMAN, again empty-handed, and WALTER exit the 30 Gardner Road Residence. After the two shook hands, BANNERMAN got into his car and left. WALTER was then later observed exiting the 30 Gardner Road garage in his vehicle. An intercepted call later

-28-

that night at approximately 8:23 p.m. indicated why BANNERMAN
left 30 Gardner Road empty-handed. During this call, WALTER began
by explaining his despair over his brother's terminal illness.
Then, WALTER apologized to BANNERMAN:  "I know we got to get that
done. Don't worry we will. I just didn't feel like.. .I just
didn't feel like doing anything." (I believe that this is a
reference to the fact that WALTER did not have the drug proceeds
in order for BANNERMAN to take when he visited 30 Gardner Road
earlier that evening).

51.  On September 10th, WALTER complained to BANNERMAN about
the quality of "shoes" (meaning marijuana) that BANNERMAN had
given him. He complained that they gave him "foot fungus," but
BANNERMAN told him to "get it done" (meaning that he would have
to make the most of it and sell it). WALTER asked how was he
supposed to get it done when there's nothing to get them done
with (meaning that he had no customers interested in low-grade
marijuana). BANNERMAN told WALTER that he would have to figure
it out. In a September 13th call, WALTER continued to complain
to BANNERMAN about the quality of marijuana. BANNERMAN told him
again that he would just have to get it done.

52.  On September 18, 2003, WALTER and BANNERMAN agreed to
meet that night. At approximately 9:27 p.m., BANNERMAN told
WALTER that he would meet him at the hotel in ten minutes. At
approximately 9:42 p.m., surveillance followed WALTER in his

-29-

vehicle from the 30 Gardner Road Residence to the vicinity of the
Sheraton Hotel near Copley Place.  There, surveillance agents saw
BANNERMAN walk from the hotel to the 1999 BMW Convertible and get
into the front passenger seat.  From there, surveillance followed
the 1999 BMW Convertible to the Boylston Street Residence, one of
BANNERMAN's residences.  At approximately 10:07 p.m., BANNERMAN
got out of the vehicle.  At this time, surveillance saw that he
was carrying a red money bag/satchel with black trim or piping
around the edges.  It appeared to be a business security money
bag with a lock on it.  BANNERMAN entered the apartment building
and WALTER departed the area in his vehicle.  During this
meeting, I believe that WALTER delivered drug proceeds to
BANNERMAN.

        53.  On September 23rd, WALTER told BANNERMAN that he had a
report for him.  WALTER also told BANNERMAN that he was not
seeing any income and needed to see him.  When WALTER asked if
those things were still secure, BANNERMAN responded that they had
been sitting in the filing cabinet for a month.  I believe this
conversation is about WALTER having drug proceeds for BANNERMAN
and WALTER'S interest in seeing him because he needed to get more
marijuana to sell to customers.  Later that day, WALTER told
BANNERMAN that he should be seeing him in a day or so.  BANNERMAN
indicated that he was upset about this scheduling.  WALTER

-30-

explained that he was trying "to get some paperwork together" (meaning collect drug proceeds).

54. The following day, September 24th, WALTER called BANNERMAN and indicated that he had some forward motion on that thing (meaning that he had made some progress in getting drug proceeds together for BANNERMAN). Later that day, they agreed to meet the following morning at 9 a.m.

55. At approximately 9:03 p.m. the next morning (September 25th), surveillance agents saw WALTER the 1999 BMW Convertible into the entrance to the Fairfield Luxury Apartments (the Boylston Street Residence) and parking there. Although WALTER was not observed going into the building, at approximately 9:27 a.m., surveillance saw WALTER and BANNERMAN exit the apartment building together. WALTER was carrying a large duffel bag over his shoulder. The bag appeared to be full and heavy as WALTER was struggling with its weight. BANNERMAN was carrying a large shopping bag. WALTER put the duffel bag in the trunk of the 1999 BMW Convertible and BANNERMAN put the shopping bag inside the passenger area of the vehicle. The two then departed in the area in the 1999 BMW Convertible. During this meeting, I believe that WALTER delivered drug proceeds to BANNERMAN and BANNERMAN delivered marijuana to WALTER.

56. On October 1, 2003, WALTER and BANNERMAN had a series of conversations and exchange of voicemail messages about

-31-

arranging to meet.  In the last of these messages, BANNERMAN said
that he would be very busy the next couple of days and now would
be a great time for them to meet.  In a call that evening at
approximately 7:28 p.m., WALTER and BANNERMAN agreed to meet at
the hotel (meaning the Sheraton Hotel in Boston) at 8 p.m.  At
approximately 8 p.m., surveillance agents saw WALTER in the 1999
BMW Convertible on Huntington Avenue, a short distance from the
Sheraton Hotel.  A few minutes later, surveillance saw WALTER
drive into the entrance of the hotel.  A few minutes later,
surveillance saw BANNERMAN enter the 1999 BMW Convertible empty-
handed.  WALTER drove around the Copley Square area for
approximately seven minutes and then parked on Boylston Street
adjacent to the Boylston Street Residence.  At approximately 8:25
p.m., another surveillance agent saw BANNERMAN exit WALTER's 1999
BMW Convertible with a legal-sized manila envelope in his hand.
He then walked toward the entrance of his apartment building.
WALTER departed the area in his vehicle.  Based upon the
interceptions and surveillance, I believe that WALTER delivered
drug proceeds to BANNERMAN on this occasion.

### WALTER'S Marijuana Customers Identified

57.  Interceptions to date over WALTER's telephones, Target
Telephone 1 and Target Telephone 2 reveal that WALTER has
numerous marijuana customers, including but not limited to the

-32-

individuals below, and has on numerous occasions collected drug proceeds from them and/or delivered marijuana to them.

### DANIEL MACAULEY

58. I believe, based upon my review of intercepted conversations between WALTER and Daniel MACAULEY, surveillance of the two and my involvement in this investigation, that MACAULEY is one of WALTER's drug customers.

59. On August 19, 2003, there were a series of intercepted calls and voicemail messages between WALTER and Daniel MACAULEY indicating that they planned to meet that night. In one of these calls, MCCAULEY explained to WALTER that he needed to see WALTER that night, but he didn't have the "paperwork" (meaning money for marijuana). In another of these calls, WALTER told MACAULEY that "if you've got a bag bring it. You got a duffel (bag), bring it." They agreed to meet the following morning.

60. The following morning, August 20th at approximately 11:50 a.m., a surveillance agent saw MACAULEY exit a Dodge Dakota pickup truck in the vicinity of WALTER's restaurant, Sally Ling's, 10 Langley Road, Newton Centre. At approximately 12:03 p.m., another surveillance agent saw MACAULEY and WALTER standing near the Dodge Dakota. WALTER removed a black bag from the Dakota and carried it toward the restaurant. At approximately 12:11 p.m., this surveillance agent saw WALTER walking toward the 1999 BMW Convertible. WALTER removed a cardboard box from his

-33-

vehicle and handed it to MACAULEY who put it in the bed of the
Dodge Dakota. A few minutes later, MACAULEY got into the Dodge
Dakota and departed the area. WALTER returned to the restaurant.
Based upon the intercepted calls and subsequent surveillance, I
believe that MACAULEY contacted WALTER to get a quantity of
marijuana from him, but did not have the money (or all of the
money) to give to WALTER at that time. During the meeting, I
believe that WALTER gave MACAULEY marijuana.

61. Later that same day, August 20, 2003, MACAULEY called
WALTER and asked WALTER to recall when MCCAULEY gave WALTER "a
couple of grand" because WALTER had no pocket money. MCCAULEY
was not sure if it was two grand ($2000) or some other amount.
WALTER assured MACAULEY that neither of them would cheat the
other so he did not need to worry and said that "we'll take care
of that, okay? ... when we get together we'll take care of
everything, okay?" MACAULEY then asked WALTER if he would have
"more" for him as soon as "he" called MACAULEY. WALTER confirmed
that, for him (meaning MACAULEY), he had "more." WALTER agreed
to give him "more in a couple of days, but call me as soon as he
call(s) you back." I believe that this conversation was about
MACAULEY's interest in getting an additional quantity of
marijuana from WALTER.

62. A few days later, on August 24, 2003, another incoming
call from MACAULEY to WALTER was intercepted. In this call,

-34-

MACAULEY reported to WALTER that he had "loads of paperwork and I'm ready to go" (meaning that he had money and was ready to get more marijuana from WALTER). WALTER replied "again?" to which MACAULEY responded "it's bad out ... it's bad out there" (meaning that WALTER was surprised that MACAULEY already needed additional marijuana and MACAULEY responding that it was difficult to get marijuana). WALTER replied, "I know, I know." He further explained that there were "only probably ten or fifteen there for ya" (meaning that he only had a certain quantity of marijuana available for MACAULEY). In response to MACAULEY's inquiry if WALTER could get more, WALTER explained, "it's just I hear nothing on the horizon" (meaning that WALTER was not sure if he could get more marijuana for MACAULEY because he was not sure that more would be arriving in the short term). WALTER further explained that he was trying to take care of MACAULEY, but that he could get "three to four more dollars for each one that I don't give to you" (meaning that he was distributing marijuana to MACAULEY at a cheaper price than he could get from other customers). When MACAULEY indicated that he understood WALTER's position, WALTER told him that he was still planning to give him "ten to fifteen" (meaning a quantity of marijuana) to hold MACAULEY over for another week or two. MACAULEY corrected WALTER and told him that this quantity would only hold him for a week or so. The two agreed to talk on Monday (August 25th).

-35-

63.  Earlier intercepted calls on Target Telephone 1 and subsequent surveillance on July 26, 2003, August 6, 2003 and August 7, 2003 revealed that MACAULEY was regularly contacting WALTER about delivering drug proceeds to him and retrieving marijuana from WALTER.  In fact, surveillance on August 7, 2003 saw MACAULEY enter 30 Gardner Road  empty-handed and exit the building shortly thereafter carrying a large box, taped shut. Based upon the surveillance agents' training and experience, the size and shape of the box was consistent with a package of 20-25 pounds of marijuana.

64.  MACAULEY continues to be one of WALTER's more regular marijuana customers.  In a series of intercepted calls between September 12 and 15, 2003, WALTER and MACAULEY made arrangements to meet.  On September 15th, WALTER told MACAULEY that he could meet him that day, but people were showing the house (meaning that the 25 Royal Road Residence, his late mother's home, and his stash house for marijuana, was being shown to potential buyers) so he wouldn't be able to get in there until later.  MACAULEY replied that he "didn't come prepared" (meaning he did not have drug proceeds to pay WALTER).  WALTER told him not to worry about it and that they would figure it out the following day.  They agreed to meet at WALTER's house.  A short time later, surveillance saw WALTER park his vehicle in front of the 25 Royal Road Residence and go inside.  After a few minutes, WALTER

-36-

emerged from the residence, placed an item in his trunk and then
drove to the garage at the 30 Gardner Road Residence. At
approximately 5:51 p.m., MACAULEY pulled up at the 30 Gardner
Road Residence. Before entering the apartment building, he
opened his trunk, looked inside and then closed it. At
approximately 6:09 p.m., MACAULEY exited the 30 Gardner Road
Residence carrying a yellow plastic bag. He then departed the
area in his vehicle. Based upon the intercepted calls and
surveillance, I believe that MACAULEY picked up a quantity of
marijuana from WALTER on this occasion.

65. In late October, 2003, WALTER and MACAULEY again met to
do a deal. In two calls on October 20 (Calls 4507, 4519) WALTER
told MACAULEY that he has more marijuana for him and they agreed
to meet the following day. A call on October 21, 2003 at
approximately 3:45 p.m. indicated that MACAULEY was traveling to
meet WALTER. Later that day, surveillance agents saw WALTER
arrive at the 25 Royal Road Residence (where he has stashed
marijuana) and enter the garage there. A short time later,
WALTER drove to the 30 Gardner Road Residence and went into the
garage. MACAULEY arrived in the area and entered 30 Gardner
Road, empty-handed. About 15 minutes later, MACAULEY emerged
from this address with a medium to large-sized cardboard box over
his shoulder, got into his car, and left the area. MACAULEY was
followed to a Dunkin' Donuts in Quincy where he met with an

-37-

individual identified as Paul Roche. Roche entered MACAULEY'S
vehicle empty-handed, but later exited the vehicle with a large
object (covered by a jacket) under his arm. From the Dunkin'
Donuts location, MACAULEY was followed to his residence in
Quincy, the 16 Roach Street Residence. Based on the intercepted
calls and surveillance, I believe that MACAULEY retrieved a
quantity of marijuana from WALTER on this occasion and that
MACAULEY then gave (at least) a portion of it to Roche.

66. More recently, on November 1, 2003, surveillance agents
saw WALTER receive a white plastic bag that appeared to contain
several square-shaped packs that were consistent with currency
from MACAULEY. Given the past interceptions and surveillance of
WALTER and MACAULEY and the fact that this surveillance was on
the heels of an intercepted call on October 31, 2003 (in which
WALTER told MACAULEY that he had just been read the riot act
[meaning by BANNERMAN who had been upset with WALTER in an
earlier conversation] and they discussed the "paperwork" [drug
proceeds] that MACAULEY would be able to deliver), I believe that
MACAULEY delivered drug proceeds to WALTER on this occasion as
well and, as recounted below, WALTER then later that day
delivered drug proceeds to BANNERMAN.

### JOHN MCCARTHY

67. Calls between WALTER and MCCARTHY revealed that
MCCARTHY (a/k/a "Butchie") was a marijuana customer of WALTER'S.

-38-

68.   On August 16, 2003, a series of telephone calls on
Target Telephone 2 between WALTER and John MCCARTHY were
intercepted.   In the first of these calls, they discussed
meeting; WALTER said, "it's not like you're not going to see me,
because eventually you gotta do that thing" (meaning that
MCCARTHY would have to see WALTER anyway to deliver drug proceeds
to him).   At the end of the call, WALTER said, "I'll get those
done.   She's just ... ya know what I mean? I gotta be very
careful."   I believe that WALTER was referring to retrieving
marijuana that was stored at the 25 Royal Road Residence --
WALTER's late mother's residence -- for MCCARTHY without the
knowledge of his sister, who was spending time at the residence).
MCCARTHY indicated that he understood.   MCCARTHY went on to say
that "I mean I'd say it's worth it for me to come back [from a
trip he planned to take]."   WALTER agreed, but told him, "you
gotta do something" (meaning provide money for the marijuana).
MCCARTHY answered by saying "the sooner they're done ..."   WALTER
finished his thought by assuring MCCARTHY that "soon as they're
done I'll call you."   I believe this discussion referred to
MCCARTHY's need to get more marijuana from WALTER and sell it, so
as to be able to continue paying WALTER.   Shortly after this call
ended, MCCARTHY called WALTER back from the same telephone
number.   In this short call, MCCARTHY asked WALTER if he needed

-39-