any "paperwork" (meaning drug proceeds) before MCCARTHY left (for his trip). WALTER told him that he did.

69. A day later, August 17, 2003, WALTER left MCCARTHY a voicemail message indicating that he "should be ready to rock tomorrow" (a reference to the anticipated marijuana transaction) and asked MCCARTHY to call him. Calls intercepted on August 18, 2003 indicated that WALTER and MCCARTHY were going to meet that day. In the latter of these calls, WALTER told MCCARTHY that he was heading over to "Mum's" (the 25 Royal Road Residence). MCCARTHY agreed to meet him there in a couple of minutes. Surveillance agents in the area saw WALTER drive from the garage at 30 Gardner Road to 25 Royal Road shortly after this call. Later that evening, a surveillance agent saw a vehicle registered to John MCCARTHY parked in front of 25 Royal Road. Approximately twenty minutes later, MCCARTHY (and WALTER's son) were observed leaving this residence. WALTER's son was carrying a light colored box; MCCARTHY was carrying a white canvas bag in one hand and an unknown object in the other hand. The two then got into MCCARTHY's vehicle and drove away. A short time later, at approximately 8:42 p.m., MCCARTHY's vehicle was observed parked in front of 30 Gardner Road. At approximately 10:07 p.m., MCCARTHY left 30 Gardner Road alone and departed the area. Based upon the substance of the preceding calls and surveillance, I

-40-

believe that MCCARTHY picked up marijuana from (and/or delivered drug proceeds to) WALTER.

70.  On September 18, 2003, WALTER called MCCARTHY and asked when he was going to be back.  WALTER explained that when MCCARTHY returned, they needed to have a "big talk" and "square that warehouse away."  I believe this was a reference to WALTER's need, discussed on many intercepted calls, to find an alternate stash location, as there were many people in and out of the 25 Royal Road Residence.  WALTER further explained that they should be multi-tasking out of there from now on, which I take to mean that the bulk marijuana would be broken up into smaller quantities at the anticipated warehouse location and distributed. When WALTER commented that he guessed that MCCARTHY was ready to step into the shoes, MCCARTHY responded affirmatively.  I believe this was a reference to earlier, intercepted conversations, in which WALTER and MCCARTHY explored the possibility of MCCARTHY's taking over the business from WALTER.  Later in the conversation, WALTER said that he had to get the "Doodle thing all down" (a reference to marijuana that had been supplied by BANNERMAN, to whom WALTER sometimes refers as "Uncle Doodle").  WALTER also mentioned that they had to pick up that toolbox because that would be the fucking decoy.  WALTER said that they would put tools in it and use the tools as a decoy.  Toward the end of the

-41-

conversation, WALTER told MCCARTHY that they had to talk to the "Doodle man" (meaning BANNERMAN).

71. Between September 26 and 27, 2003, WALTER and MCCARTHY had a series of conversations regarding packing up marijuana or marijuana-related items from the 25 Royal Road Residence, which WALTER had been using as a stash house. For example, on September 27th, when MCCARTHY asked about the timing of packing up, WALTER explained that he was "a little constrained" (likely referring to the fact that his family, specifically sister, was spending a lot of time at the residence and potential buyers were looking at the property and it was difficult for WALTER to get in and retrieve marijuana and marijuana-related items). WALTER started to say that he "got the, you know what I mean" and MCCARTHY indicated that he understood. WALTER further said that he had promised MCCARTHY his decent stuff, but it was not accessible right then. I believe that this latter part of the conversation is referring to WALTER having decent grade marijuana for MCCARTHY, but explaining that he cannot get to it right now because there were too many people at the 25 Royal Road Residence. On October 4, 2003, WALTER talked to MCCARTHY about his need to move more marijuana to a new stash location.

72. Interceptions and surveillance on October 9, 2003 indicate that WALTER and MCCARTHY were indeed using the Watson Place Storage Unit to store and process marijuana. On that day,

-42-

MCCARTHY and WALTER agreed to meet.  MCCARTHY picked up WALTER;
after some stops, the two drove to the Watson Place Storage Unit.
A surveillance agent saw MCCARTHY's SUV park at the rear of 1
Watson Place, building four.  WALTER got out of the SUV and went
into building four, carrying a large black nylon bag.  A few
moments later, MCCARTHY followed him.  (In a call intercepted at
this time, WALTER told his interlocutor that he was "at the
warehouse.")  A surveillance agent followed the sound of WALTER's
voice toward a storage unit on the first floor; as he drew closer
to WALTER, he heard a crinkling, ripping sound, as is made by
cellophane or plastic wrapping being torn.  Shortly after the
agent heard these noises, WALTER called BANNERMAN and left a
message that there was "a problem" and asked BANNERMAN to call
him back.  WALTER then left MCCARTHY in the building, got in
MCCARTHY's car, and drove away.

73.  Within half an hour, WALTER received a call from Robert
Pineyro, a suspected marijuana customer of WALTER's.  Pineyro
commented that he had expected to hear from WALTER (based on a
conversation the prior day); WALTER responded that he had looked
at it and that, although the wrappings had looked good, "it was a
Pandora's box."  WALTER went on to say that he thought he might
have to return it.

74.  In a call shortly thereafter, WALTER complained to
BANNERMAN that "it wasn't too pretty."  BANNERMAN became irate,

-43-

telling WALTER not to talk, and that they should meet instead.   I
believe, based on my participation in this investigation and on
my training and experience, that WALTER and MCCARTHY opened a
load of marijuana in the Watson Place Storage Unit; that WALTER
was disappointed with its quality, as reflected in his call with
Pineyro; and that WALTER called BANNERMAN, his source, to
complain that the marijuana was of poor quality.

### John GRAHAM

75.   GRAHAM is a Canadian citizen and was born in 1961.
The Bureau of Immigration and Customs Enforcement has informed
DEA that GRAHAM is a resident alien of the United States.
Various calls from telephones associated with John GRAHAM also
reveal that GRAHAM is one of WALTER's marijuana customers.
GRAHAM, whom WALTER refers to as "JG" or "G-Man," has called
Target Telephone 1 on numerous occasions.

76.   In late July, 2003, a series of calls reflected
GRAHAM's interest in purchasing marijuana from WALTER for
distribution.   On July 30, 2003 at 9:02 a.m., WALTER called (617)
290-2240, subscribed to GRAHAM, and asked if he "want[ed] to get
that done today?"   The two agreed to talk later.   In a call that
night, at 6:09 p.m., WALTER called GRAHAM again and the two
agreed that WALTER would see him in about twenty to thirty
minutes.   Shortly thereafter, at approximately 6:38 p.m.,
surveillance agents saw a silver Jeep, registered to GRAHAM,

-44-

arrive and park in the vicinity of 30 Gardner Road.  Agents saw
an individual, later identified as GRAHAM, exit the vehicle and
enter the apartment building at 30 Gardner Road.  At
approximately 6:45 p.m., a surveillance agent saw GRAHAM exit 30
Gardner Road carrying a brown cardboard box and then place the
box in the rear of his vehicle.  GRAHAM then left the area in his
car.  At approximately 6:51 p.m., another surveillance agent saw
WALTER exit the garage at 30 Gardner Road in the 1999 BMW
Convertible.  Based on intercepted calls, and on the agents'
observation, I believe that GRAHAM picked up marijuana from
WALTER during this meeting.

     77.  In a later intercepted call with GRAHAM on August 8,
2003 (approximately one week after the surveillance described
above), WALTER asked "how's that thing working out for you?  You
still got some left?" (meaning how was the marijuana and whether
he had any of it left).  GRAHAM replied affirmatively, "yeah, but
I wanted to maybe put you on standby, maybe for Monday."  WALTER
answered "for you?" to which GRAHAM said "yeah."  WALTER then
said that he did not think that would be a problem.  I believe
that this exchange indicated that GRAHAM still had some marijuana
left, but that he may want to get more marijuana from WALTER the
following Monday.

     78.  GRAHAM continued to seek marijuana from WALTER into
early November, and the calls reflect that WALTER had no

-45-

marijuana supply until November 9. For example, in a September 25, 2003 call, WALTER explained that he did not have any word yet. GRAHAM complained to WALTER about the difficulty of finding marijuana, saying that he had a big problem with his other boy (meaning his alternative source of supply). WALTER said that the rates on the project are on the increase (meaning the price for marijuana has increased), and that he would have a better answer this week. GRAHAM said that it's like 5, 10, 10, 20, 10, you know what I mean (likely references to quantities of marijuana that GRAHAM wished to purchase from WALTER). The following day, September 26th, WALTER and GRAHAM spoke again. WALTER told GRAHAM that he would have some feedback, but not until the next week. GRAHAM replied that he (possibly a marijuana customer) would be gone until the ninth. WALTER replied that they should be in very, very good shape by then (in terms of supply of marijuana). On Tuesday, September 30th, WALTER told GRAHAM that he had no word yet, but that "it's like the fucking Sahara desert out there" (meaning that WALTER was having difficulty getting additional quantities of marijuana).

79. On October 4<sup>th,</sup> WALTER told GRAHAM that he did not have any at all (meaning drugs), not even for GRAHAM. WALTER explained that he does not even have a "bone" (a reference to a marijuana cigarette) and that he does not even do it any more. (I believe this was a reference to WALTER's plans to hand the

-46-

business over to MCCARTHY.)   From the subsequently intercepted calls that day, it seems apparent that WALTER was able to get a supply of drugs for GRAHAM that day.

### SCOTT MYERS

80.   Based on the investigation, including the information provided by CW-1, described above in ¶¶29-30, I believe that MYERS has been engaged by WALTER to collect a drug debt owed to WALTER by Mohamed Ash-Fouad for 18 pounds of WALTER's marijuana that CW-1 gave to Ash-Fouad on consignment.

81.   On August 16, 2003, there were a series of intercepted calls on Target Telephone 2 between WALTER and MYERS.[14]

82.   CW-1 and WALTER had several conversations via Target Telephone 1 on August 25, 2003 regarding their plans to meet that night so that CW-1 could deliver drug proceeds and deliver money that was supposedly from Mohamed Ash-Fouad's cousin, Mousa Hossam

---

[14]These calls used telephone number (617) 437-8422, subscribed to Michelle Sadler, 405 Columbus Avenue, Apartment 603, Boston, MA.  Based upon the investigation to date and subsequent surveillance, the user of this telephone is Scott MYERS. For example, calls intercepted via Target Telephone 2 on August 17, 2003 indicated that WALTER was going to make the delivery to MYERS that morning.   In the latter of these calls, MYERS confirmed that his address was "405 Columbus (Avenue)", the same address as the subscriber address for the telephone number subscribed to in the name of Michelle Sadler that MYERS had been using to communicate with WALTER.   At approximately 9:43 a.m., WALTER on Target Telephone 1 called MYERS to tell him that he was downstairs.   A few minutes later, surveillance agents in the area saw WALTER arrive in the 1999 BMW Convertible and pull behind 405 Columbus Avenue.   WALTER was driving and his son was in the front passenger seat.   An individual later identified as MYERS walked from the direction of the building to the 1999 BMW Convertible.

-47-

(a/k/a "Sam") toward Ash-Fouad's marijuana debt.[15]  CW-1 and WALTER met that night and, during that meeting, CW-1 gave WALTER approximately $11,500 (of this sum, $7250 was for the five pounds of marijuana that CW-1 had recently received from WALTER; $1000 was toward CW-1's remaining debt for marijuana previously "fronted" to it by WALTER; and the remainder of the money was intended to be from Sam toward Ash-Fouad's marijuana debt). During this meeting, WALTER told CW-1 that he appreciated that Ash-Fouad's cousin was going to pay down Ash-Fouad's drug debt, but that if he did not receive regular payments then Scott MYERS would continue to look for Ash-Fouad and would put a "beating on him."  WALTER, however, also made clear that MYERS had not found Ash-Fouad when he had gone looking for him (before CW-1 related the ruse that Ash-Fouad's cousin was going to give it cash to pay off debt to WALTER).

83.  On September 3, 2003, at approximately 7:40 p.m., CW-1 at DEA's direction and under surveillance went to the pizza shop owned by Ash-Fouad's cousin, Sam.  This was in DEA's continuing attempt to stem any threat against Ash-Fouad arising out of his drug debt (without compromising the ongoing investigation) and to

---

[15]In an attempt to head off any attempt by WALTER and MYERS to use force or threats to collect the outstanding marijuana debt from Ash-Fouad, CW-1 had, at DEA's direction, contacted WALTER and explained that Sam, Ash-Fouad's cousin, had agreed to pay off Ash-Fouad's debt in installments.  WALTER seemed pleased with this resolution and later told MYERS about it.

verify whether MYERS had visited Sam as WALTER had claimed in his August 25th meeting with CW-1 (and as MYERS had claimed in an earlier conversation with CW-1). During their meeting, Sam confirmed that a black male (MYERS is a black male) had visited him at the pizza shop the previous weekend looking for Ash-Fouad. Sam related that he had told this male that he hadn't seen Ash-Fouad in some time. As it had done earlier in the summer by telephone, CW-1 explained the situation (i.e., that Ash-Fouad owed money and WALTER (via MYERS) was looking to collect and threats had been made against him). CW-1 also explained that it had told WALTER that Sam was making payments toward Ash-Fouad's debt and that CW-1 had already made a payment to WALTER that WALTER believed was from Sam. Sam gave CW-1 a telephone number to contact Ash-Fouad. (This telephone number appears not to be a good one since CW-1, in the presence of Sam, attempted to contact him and the line seemed to be disconnected). CW-1 told Sam that if the black male (presumably MYERS) came back, he should call the police. Sam indicated that he was not afraid of the male and the matter was unrelated to him.

84. On Tuesday, September 9th, WALTER called CW-1 and asked CW-1 if it had heard from "that guy" (meaning Sam, Ash-Fouad's cousin) and that WALTER and CW-1 should meet after it did. In regard to Sam's future payments on Ash-Fouad's drug debt, WALTER told CW-1 that he hoped that Sam was not going to get "flaky" on

them (meaning renege on the agreement to pay off Ash-Fouad's debt) "because I don't want to have to go in that direction" (meaning that he did not want to have to resort other means, such as having MYERS look for Ash-Fouad again, to collect the debt).

85.    MYERS is also a marijuana customer and potential supplier of WALTER's.    For example, in a coded conversation on August 6, 2003, the two discussed what I believe to be a possible sale of marijuana from MYERS to WALTER.    WALTER asked MYERS if he had "been in touch with that boy?"    In response, MYERS said, "he's got all the rugs ready, but he's talking, he's going five down ... where he grabs them down there in Arizona."    WALTER asked MYERS, "why don't you get a picture ... you know, get some snapshots..."    MYERS answered that he did "try to get a picture, 'cause I wanted you ... to have someone go and appraise the property."    I believe that the references to "rugs," "carpets" and "property" are all references to marijuana, and that the requests for "snapshots" and "pictures" are for samples of marijuana.    I know that Arizona is a source location for marijuana (and not for carpets); the shifting code throughout the conversation indicates to me that the parties are attempting to conceal the true nature of their discussions.

86.    On September 8, 2003, MYERS called WALTER on Target Telephone 2.    WALTER said that he had something for MYERS, but would not be able to see him until the following day.    When MYERS

complained about having no money, WALTER said that he would give MYERS some money as well. The next evening, after an intercepted call over Target Telephone 1 indicated that MYERS was going to meet WALTER, surveillance agents saw MYERS exiting the 30 Gardner Road Residence carrying a package and getting back in his car with it. (WALTER was at home; over Target Telephone 2, surveillance agents heard him answering his door intercom, on which MYERS' voice was heard.) A call late that night confirmed that MYERS had seen WALTER earlier that night. Based upon these interceptions (and previous interceptions between WALTER and MYERS), I believe that MYERS retrieved a quantity of marijuana from WALTER on September 9th and that he may have also received some money from WALTER at this time (although it is not yet clear if this money was toward MYERS's assistance in the Ash-Fouad matter, stolen merchandise or some other matter).

### JOSE VEZGA

87. Intercepted calls reveal that VEZGA, a mechanic, is also a marijuana customer of WALTER'S. VEZGA has been working on WALTER's own vehicle, WALTER's BMW and had loaned the 1999 BMW Convertible to WALTER.

88. In a August 7, 2003 call, WALTER told VEZGA that he a "a little bit of work left for you" (meaning he had a small quantity of marijuana for VEZGA). When VEZGA asked for clarification of "a little bit," WALTER further explained that

-51-

it was "not so little, just you know, half a little, you know
what I mean" (again, referring to a quantity of marijuana).
VEZGA replied that it would be fine.

89. On August 18, 2003, intercepted calls from VEZGA to
WALTER on Target Telephone 2 indicated that he was in the
vicinity of the 25 Royal Road Residence and the 30 Gardner Road
Residence. At approximately 8:40 p.m., a surveillance agent saw
a blue Ford Escape SUV parked in front of the 25 Royal Road
Residence. One minute later, VEZGA told WALTER that he was at
his mother's house (meaning 25 Royal Road, Brookline); WALTER
told him to come to his (WALTER's) house (meaning the 30 Gardner
Road Residence). The blue SUV then drove from 25 Royal Road to
30 Gardner Road and parked there. Approximately one hour later,
a surveillance agent saw VEZGA and an unidentified woman exit 30
Gardner Road and enter the blue SUV. VEZGA was carrying a light-
colored, plastic, grocery-type bag that appeared full and the
woman was carrying an unknown object. VEZGA and the woman got
into the vehicle and left the area.

90. On August 22, 2003, VEZGA left a message for WALTER
that he was on his way to there to "pick up." A few hours later,
WALTER and VEZGA spoke live via Target Telephone 2. During this
conversation, VEZGA made reference to leaving the "cover."
WALTER told him that he should have thrown it away. VEZGA
replied that he had no place to throw it away. WALTER responded

-52-

that he should have wrapped it in a bag and thrown it away.
VEZGA said that he put it in the grill. I believe that this
conversation concerned the wrappings of marijuana that VEZGA had
picked up from WALTER, and that WALTER was concerned that VEZGA
had not properly disposed of the wrappings (probably because they
may continue marijuana residue and/or his fingerprints). Like
marijuana that WALTER had previously supplied to CW-1, DEA
believes that the marijuana that VEZGA received was likely
double-wrapped.

91. Interceptions and surveillance on September 29, 2003
indicated that VEZGA helped WALTER in retrieving a large toolbox
(to be used to store marijuana) from the CW-1's residence to
WALTER's new stash location in Framingham (the "Watson Place
Storage Unit").[16]

92. At approximately 4:11 p.m. on September 29th,
surveillance agents saw a white van drive into the driveway of
CW-1's residence. Moments later, WALTER entered CW-1's residence
(and a short time later, VEZGA entered and joined them). Agents
monitored this meeting by video/audio recording equipment.

---

[16]CW-1 had previously shown me the metal box that it
discussed with WALTER. The box is a Husky brand, heavy duty
storage container that is approximately five feet in length and
three feet in width and three feet in depth, of the type commonly
placed in the bed of a pick-up truck and used by contractors.
Based upon my training and experience, I believe that the box is
capable of storing a large quantity of marijuana.

During the course of this meeting, CW-1 paid WALTER $7,000 for marijuana that WALTER had previously provided. At approximately 4:19 p.m., surveillance agents saw the three walk out of the residence and go to the rear of the yard where the toolbox was located. WALTER and VEZGA removed the box from a storage tent and put it on the ground behind the van. CW-1 showed WALTER and VEZGA the how to open and close the tool box, then WALTER and VEZGA put the box into the rear of the van and left. Surveillance agents followed the van to Framingham, where its occupants went into the rear of a building near the corner of Watson Place and Concord Street, inside which the Watson Place Storage Unit is located. They then returned to the van, retrieved the tool box and brought it to a garage door marked #10. At approximately 5:02 p.m., surveillance observed WALTER and VEZGA exit the building and depart the area in the van.

### DRUG TRAFFICKERS' USE OF RESIDENCES GENERALLY

93.  I have participated in the execution of numerous search warrants at the residences of drug-traffickers such as the targets of this investigation. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following kinds of drug-related evidence have typically been recovered:

   a)   controlled substances, such as marijuana;

   b)   paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such

as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices;

c)   books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

d)   personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

e)   cash, currency, and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as precious metals such as gold and silver, and precious gems such as diamonds;

f)   documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills; and

g)   firearms and other dangerous weapons.

94.  In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

95.    Based upon my training and experience, as well as the
training and experience of other law enforcement agents I have
worked with, I am aware that it is generally a common practice
for drug traffickers to store their drug inventory and drug-
related paraphernalia (as described above) in their residences.
My experience with marijuana traffickers, in particular, is that
when they keep the drugs in their homes, they take pains to
conceal the overwhelming smell of the drug.   These efforts often
involve scented fabric softeners (e.g. Bounce), laundry
detergent, and air fresheners.   Further, it is generally a common
practice for drug traffickers to maintain in their residences
records relating to their drug trafficking activities.   Because
drug traffickers in many instances will "front" (that is, sell on
consignment) controlled substances to their clients, or
alternatively, will be "fronted" controlled substances from their
suppliers, such record-keeping is necessary to keep track of
amounts paid and owed, and such records will also be maintained
close at hand so as to readily ascertain current balances.   Often
drug traffickers keep "pay and owe" records to show balances due
for drugs sold in the past ("pay") and for payments expected
("owe") as to the trafficker's suppliers and the trafficker's
dealers.   Additionally, drug traffickers must maintain telephone
and address listings of clients and suppliers and keep them

-56-

immediately available in order to efficiently conduct their drug trafficking business.

96.   Based upon my training and experience, I am also aware that it is generally a common practice for traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances.   In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.   Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

97.   Based upon my training and experience, I am aware that drug traffickers often possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

98.   My experience with marijuana traffickers, in particular, is that they tend to have larger scales than traffickers in other drugs (because marijuana is so bulky); in addition, they tend to have many baggies for packaging the drugs for re-sale, again because of the bulk of the drug.   Because marijuana is such a profitable drug to sell, marijuana

traffickers sometimes also have money-bands (or rubber-bands) for use in packaging bulk cash, as well as money-counters.

99.  Based upon all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth hereinafter, I believe that WALTER, BANNERMAN and MACAULEY, like many drug traffickers, have used their residences in furtherance of their drug trafficking activities, and that evidence regarding those activities, including, but not limited to, cash, drugs, drug ledgers, and other tools of the drug trade will be found in each of their residences.

### DRUG TRAFFICKERS' USE OF "STASH LOCATIONS" GENERALLY

100. It has been my experience that drug traffickers use "stash locations" for their drugs, in order to avoid keeping large quantities of the drugs in their residences.  (This is particularly true in the case of marijuana, which is both bulky and strong-smelling.)  Stash locations also provide some measure of security for drug traffickers, who are concerned about being robbed.  Stash locations provide privacy so that traffickers can break down and package the drugs, often with assistance from associates, at a location away from their homes and families.  A stash location also provides some anonymity for the delivery of bulk drugs; in this way, a drug trafficker can receive a shipment

of drugs without letting the courier (or other members of the supply organization) know where he or she lives.

## THE TARGET LOCATIONS

101. Recent interceptions (and/or surveillance conducted in relation to some of these interceptions) reveal, among other things, that WALTER is still communicating and/or meeting with numerous marijuana customers to provide marijuana to some of them or collect drug proceeds from some of them; WALTER is still delivering drug proceeds to BANNERMAN; BANNERMAN has informed WALTER, in coded language, that he soon expects a load of marijuana and WALTER has passed this information along to several customers that a delivery is now due in mid-November 2003; and BANNERMAN has been making arrangements with associates, namely Henry Hart Johnson, to arrange for the receipt, preparation and/or transport of marijuana (often referred to as "raking leaves") on or about November 14, 2003. All of this recent activity strongly indicates that the operation in which WALTER, BANNERMAN and others are involved may soon receive a load of marijuana. Surveillance today, November 14, 2003, confirms that Johnson has arrived as planned, and was picked up at the airport by BANNERMAN, who brought him to the Boylston Street Residence. The two men have been seen together traveling around the Boston area in BANNERMAN's car, making stops at, among other places, a bank, a check-cashing business, and a Western Union store.

## The 30 Gardner Road Residence

102. As discussed above, the 30 Gardner Road Residence is the current residence of Kurt WALTER. A further description of this residence is provided in Attachment A-1 hereto. I and other law enforcement agents have conducted surveillance at this location on numerous occasions and have seen WALTER arrive and depart from this residence on numerous occasions. I and other agents have also observed WALTER's BMW and the 1999 BMW Convertible parked in front of this residence on numerous occasions. Upon visual inspection, I saw the name "WALTER" on the first-floor registry listing for Apartment 2C. Moreover, during the course of the wiretap, WALTER has provided the number "2C" to various marijuana customers who were coming to meet him at 30 Gardner Road. For example, on October 4, 2003, arranging to meet with GRAHAM, WALTER told him, "2C."

103. I believe, based upon my review of calls intercepted over WALTER'S telephones, physical surveillance, and other information developed during the course of this investigation, as recounted above, that WALTER conducts drug trafficking activities from this location. I believe, based upon my work on this investigation that WALTER's customers have obtained marijuana from WALTER at this location and have delivered drug proceeds to WALTER at this location. (For example, see ¶¶34-35,45,52,76,89, above.)

104. Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at the 30 Gardner Road Residence presently contain the items set forth in Attachment A-2 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I believe that a search of the 30 Gardner Road will reveal substantial evidence of regarding WALTER'S use of narcotics proceeds, among other things, to buy an interest in Sally Ling's restaurant.

## The 25 Royal Road Residence

105. As discussed above, the 25 Royal Road Residence is the former residence of WALTER's mother and has been used as a stash location for marijuana by WALTER. A further description of this residence is provided in Attachment B-1 attached hereto. As recounted above, I and other law enforcement agents have conducted surveillance at this location on numerous occasions and have observed WALTER stop at this location before meeting marijuana customers at his residence, the 30 Gardner Road Residence, and/or meet customers in the vicinity of the 25 Royal

Road Residence. For example, please refer to ¶ _71?_ above, describing WALTER's trip to the 25 Royal Road Residence before a suspected marijuana transaction with MACAULEY. Moreover, a number of intercepted calls between WALTER and his sister, Melissa Walter, indicate that WALTER is using the 25 Royal Road Residence as a stash location for marijuana and drug paraphernalia. For example, on September 20, 2003, Melissa Walter left a message for WALTER on Target Telephone 2. She explained that she was at "Mum's" (meaning the 25 Royal Road Residence). She explained that they were going through the basement and found all these little moist buds of pot. She went on to say that WALTER could not have pot up there any more because the realtor was going to be coming through the house. Specifically, she told him that there could be no more dope and no parties and no hanging out up here anymore. She asked him to give her a call. On September 21, 2003, Melissa Walter instructed WALTER that he needed to get the digital scale out of "Mum's house" (meaning 25 Royal Road). She lectured WALTER that he "can't be doing that in the house" and noted that it was "covered with weed." Melissa WALTER also told WALTER that there were "tons of buds" (meaning marijuana) all over the floor.[17]

---

[17]There was also at least one intercepted call and subsequent surveillance indicating that WALTER had been storing firearms at 25 Royal Road, Brookline. On September 25th, WALTER's sister left a message for WALTER about dropping the price of the house at 25 Royal Road. In this message, she also

Although subsequent calls have indicated that WALTER's family has received an offer to purchase the 25 Royal Road Residence, it is not clear that WALTER has removed these items or has completely ceased using this location as a stash location for items relating to his drug trade.

106. Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at the 25 Royal Road Residence presently contain the items set forth in Attachment B-2 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense,

---

requested that WALTER remove what she identified as fake guns from the closet because they were freaking potential house buyers out. WALTER returned this call and told his sister to put the fake guns in the basement. Since open houses have been held to show the 25 Royal Road property to potential buyers, a surveillance agent (posing as potential buyer) had earlier visited the residence on September 14, 2003. During that tour, the agent saw firearms in two locations in the house. The first was in a second floor hallway closet; the second location was a second floor bedroom. It appeared to this agent that these firearms were not fake, but were real firearms. More recently, WALTER has been intercepted asking a friend if the friend would take some of the guns, because WALTER had to get rid of them. The friend indicated interest, but lives out of state. To my knowledge, the guns have not been removed from the 25 Royal Road Residence. On October 31, 2003, in a conversation with his sister, WALTER told her that he would hide the guns (in the house).

specifically, a violation of 21 U.S.C. §846.   In particular, I

believe that a search of this location will reveal, among other

things, narcotics and documentary evidence reflecting past and

present narcotics transactions between and among the other

targets of this investigation.

### Watson Place Storage Unit

107. As discussed above, the Watson Place Storage Unit is a

location in Framingham that WALTER has recently been using as a

stash location for items related to his drug trade.  A further

description of this location is provided in Attachment C-1

attached hereto.  I and other law enforcement agents have

conducted surveillance at this location on numerous occasions and

have observed WALTER arrive and depart from this location on

numerous occasions.

108.  For example, on September 29, 2003, as described more

fully above in ¶92, VEZGA and WALTER moved a large toolbox,

borrowed from CW-1 for marijuana storage, to the Watson Place

Storage Unit.  As described in ¶72, on October 9, 2003, WALTER

and MCCARTHY went to the Watson Place Storage Unit, and WALTER

discovered that the quality of marijuana stored there was poor.

I believe this marijuana is still at the Watson Place Storage

Unit; within the past week, in a call with MACAULEY, WALTER told

MACAULEY that he had only "that other stuff," or words to that

effect, and MACAULEY declined.  I believe this was a reference to the marijuana in the Watson Place Storage Unit.

109. Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at the Watson Place Storage Unit presently contain the items set forth in Attachment C-2 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846.

### The Boylston Street Residence

110. As discussed above, the Boylston Street Residence is the one of the residences of BANNERMAN.  (Although the apartment is not rented in BANNERMAN's name, but in the name of a former girlfriend, he has been surveilled going in and out of the building many times, both before and after meetings with WALTER, and the U.S. Postal Service confirms that BANNERMAN receives mail at this address.)  A further description of this residence is provided in Attachment D-1 attached hereto.  I and other law enforcement agents have conducted surveillance at this location on numerous occasions and have observed BANNERMAN arrive and depart from this residence on numerous occasions following

-65-

meetings with WALTER and/or other drug associates. For example,
on September 25, 2003, as described above in ¶55, WALTER and
BANNERMAN were seen leaving this location carrying a large,
apparently heavy duffel bag believed to contain marijuana. Also,
as described generally above, and specifically in ¶¶52,56,
BANNERMAN has been seen returning to this location on several
occasions after meeting with WALTER and receiving what are
believed to be drug proceeds. Most recently, on November 10,
2003, a series of intercepted calls reflected that MACAULEY had
$12,000 to pay WALTER. Subsequent surveillance showed the two
men meeting at the 30 Gardner Road Residence; MACAULEY walked
into the building carrying a white, plastic bag wrapped around a
block-like object that appeared to me to be a stack of U.S.
currency. After a few minutes, MACAULEY left (empty-handed) and
was surveilled to the 16 Roach Street Residence; shortly
thereafter, WALTER called BANNERMAN and the two arranged to meet
downstairs at the building in which the Boylston Street Residence
is located. Surveillance agents saw WALTER drive out of the 30
Gardner Road Residence and go to the Boylston Street Residence.
WALTER pulled up in front and called BANNERMAN, who came to the
car carrying a stainless-steel folder. BANNERMAN spent a brief
time in WALTER's car and then went back into the Boylston Street
Residence.

111. Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at the Boylston Street Residence presently contain the items set forth in Attachment D-2 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846.  In particular, I believe that BANNERMAN keeps, among other things, drug proceeds in the Boylston Street Residence, as well as narcotics and documentary evidence reflecting past and present narcotics transactions between and among the other targets of this investigation.

## The Duxbury Property

112. As discussed above, the Duxbury Property is the one of the residences of BANNERMAN and is held in his name.  Telephonic surveillance over Target Telephone 3 (on, to name a few dates, August 16, 17, 22, 23, and 25, 2003; September 20 and 22, 2003; and October 17, 2003) establishes that BANNERMAN uses the Duxbury Property as a residence.  GPS surveillance has revealed that BANNERMAN's car (and, presumably, BANNERMAN) were at the Duxbury Property on various dates during October, 2003.  Because of the

-67-

isolated location of the Duxbury Property and efforts undertaken by BANNERMAN to ensure its privacy (for example, the installation of an approximately eight-foot tall, opaque fence that completely encloses the large lot, including the house and two out-buildings) have kept DEA from conducting effective visual surveillance of the property during the course of the investigation.  Calls reveal that BANNERMAN is engaged in extensive renovation of the property, including installation of the fence described above, building of a patio and spa, and interior renovations such as painting.  A further description of this residence is provided in Attachment E-1 attached hereto.

113. Since August, 2003, calls between BANNERMAN and Henry Hart Johnson, an associate who arrived today from Chicago, have indicated that Johnson needs money and is eager to come "rake leaves" for BANNERMAN.  BANNERMAN continued, until recently, to tell Johnson that the leaves "didn't fall yet," and that he would contact Johnson when they did.  Beginning approximately ten days ago, BANNERMAN started encouraging Johnson to look into flights and to start making arrangements to come to the Boston area.  The two continued to use the phrase, "rake leaves" in their discussions about what Johnson was coming to do.  The substance of the conversations indicated to me that Johnson would go to the Duxbury Property when he arrived; for example, in calls from the Duxbury Property, BANNERMAN told Johnson that the leaves

-68-

completely covered the yard, and that he could not see the
driveway.  Johnson told BANNERMAN that he wanted to use the hot
tub (newly installed at the Duxbury Property), but BANNERMAN told
him that he had drained it.  In another call, BANNERMAN told
Johnson he would pick him up at the airport and bring him down
there, but that Johnson might only see BANNERMAN "the first and
the last day."  (Discussions reflected that Johnson expected to
arrive on November 14 and leave on November 18.)  In another
recent call, BANNERMAN confirmed that Johnson would arrive on
November 14, and could leave as early as November 15.

114. On November 14, Johnson arrived at Logan Airport and
was picked up by BANNERMAN.  In a call between BANNERMAN and
Karen Woo, BANNERMAN indicated that he and Johnson would not go
down to "work on the leaves" that day because of the high wind;
instead, they planned to head down to Duxbury that night, and
Johnson would begin the next day.  In the morning of November 15,
BANNERMAN and Johnson were seen raking leaves outside the Duxbury
Property and taking the leaves to the town dump.  It is my
belief, based on BANNERMAN's aversion to having drug-related
conversations on the telephone (e.g., ¶74) and on his sensitivity
to surveillance (as demonstrated by the fence around his
property, as well as by counter-surveillance maneuvers taken
while driving) that BANNERMAN's leaf-raking is part of a plan to
conceal his and Johnson's criminal conduct, in the event that

anyone has been monitoring his calls.  Because the conversations

between BANNERMAN and Johnson about "raking leaves" (and

Johnson's need to make money thereby) began in August -- not

leaf-raking season -- and because they were so frequent and so

urgent, I continue to believe that Johnson has not actually flown

from Chicago to Boston for the sole purpose of helping BANNERMAN

clear his yard.

115. Based upon the foregoing, and based upon my training

and experience, I submit that there is probable cause to believe

that the premises located at the Duxbury Property presently

contain the items set forth in Attachment D-2 that is attached

hereto and incorporated herein, and that those items constitute

evidence of the commission of a criminal offense, contraband, the

fruits of crime, things otherwise criminally possessed, and

property designed or intended for use or which is or has been

used as the means of committing a criminal offense, specifically,

a violation of 21 U.S.C. §846.  In particular, I expect that a

search of the property will reveal documentary or other evidence

showing the use of drug money to complete extensive renovations

of the property; records of drug trafficking; and books, records,

notes, ledgers, photographs, and any other papers or records

relating to the purchase, sale, and/or distribution of controlled

substances, including those reflecting the identity of co-

conspirators and drug customers.

### Woo Residence

116. The Woo Residence is the home of Karen Woo, and the location of "Woo Design," a company for which BANNERMAN claims to work. One of the Target Telephones used by BANNERMAN (Target Telephone 3) is subscribed to Karen Woo, at the Woo Residence. In documents submitted by BANNERMAN in connection with his purchase of the Duxbury Property, Karen Woo claims to be his employer, paying him a weekly income. A W-2 form was attached thereto, reflecting a "salary" paid by Woo to BANNERMAN. I believe, based on information learned during this investigation, that BANNERMAN's "employment" by Woo is a sham. Although interceptions on the Target Telephones reveal that the two talk, on average, five times a day, none of the over-600 calls between BANNERMAN and Woo deal with BANNERMAN's doing any work for Woo. Instead, the two discuss the renovations to the Duxbury Property, in which Woo seems to be involved, as well as what information they are planning to report on their taxes (an apparent effort to coordinate returns). In addition, various intercepted calls between Woo and BANNERMAN reflect that each makes payments to the other, described as payments in connection with the companies owned or operated by each (Woo Design and a business name used by BANNERMAN, "BT-LT Novelties").

117. Specifically, on one occasion, Woo asked BANNERMAN if he planned to claim "corporate housing," presumably on his tax

-71-

return.  He replied that he did not, and asked her why she was
inquiring.  She replied that she had attempted to claim his
corporate housing as an expense for the prior year, and was
planning to do so this year only if BANNERMAN was planning to do
so.  BANNERMAN indicated that he was not, as his accountant had
discouraged it.  Woo then went on to calculate what BANNERMAN's
actual monthly housing cost was, and to consider claiming that
amount, but eventually rejected it because it was "too much
money" and she could not "afford to have something that big" on
her tax return.

118.  In another series of recorded calls, Woo called
BANNERMAN on Target Telephone 3 when he was at his accountant's
office and apologized for not having brought him the "file."
BANNERMAN was very short with her and the phone call ended.  In
an apologetic later call, BANNERMAN told Woo that he had been
unable to talk because he had been with the accountant.  She
offered to provide him with the file later that day, but he
replied that "any time" was fine and reiterated that there was no
longer a rush for him to get the documents.  I believe that
BANNERMAN was looking for the file, presumably financial
information, before he met with his accountant; because Woo
failed to provide it in time, BANNERMAN no longer felt any
urgency to get the file.  A further description of this residence
is provided in Attachment F-1 attached hereto.

119. Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at the Woo Residence presently contain the items set forth in Attachment F-2 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I expect that a search of the Woo Residence will reveal documentary or other evidence of BANNERMAN's and Woo's financial dealings, including Woo's sham employment of BANNERMAN, which I believe are designed at least in part to conceal BANNERMAN's drug-related earnings.

## 16 Roach Street Residence

120. The 16 Roach Street Residence is the current residence of MACAULEY. A further description of this residence is provided in Attachment G-1 attached hereto. As described above, particularly in ¶¶65, 110, MACAULEY returned to that location after meeting with WALTER for what I believe to be marijuana transactions.

121. Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at the 16 Roach Street Residence

-73-

presently contain the items set forth in Attachment G-2 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846.  In particular, I expect a search of the 16 Roach Street Residence will reveal, among other things, marijuana, marijuana proceeds, packaging materials for the distribution of marijuana, and records and other evidence related to marijuana distribution.

## CONCLUSION

122.   Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises identified above and in the attachments hereto presently contain the items set forth above and in the attachments hereto, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, violations of Title 21, United States Code, Sections 846.  Accordingly, I respectfully request that a search warrant be issued for the

-74-

seizure of these items in each of the subject premises described above.

123. Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that Douglas BANNERMAN, Kurt WALTER (a/k/a "Cort"), Gary NEWELL, Daniel MACAULEY, JOHN MCCARTHY, JOHN GRAHAM (a/k/a "JG" or "G-Man"), Scott MYERS, and Jose VEZGA did knowingly and intentionally conspire, combine, and agree with each other and with and others known and unknown to the government, to possess with intent to distribute and to distribute marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. §846.

DENNIS BARTON
Special Agent
Drug Enforcement Administration

Subscribed and sworn to
before me, this _15_ day
of November 2003.

Robert B. Collings
United States Magistrate Judge

-75-

## Attachment A-1

**30 Gardner Road**
**Apartment 2C**
**Brookline, MA**

The building is a large multi-story, multi-apartment building, Apartment 2C is located on the second floor and the entrance is located in the common hallway. The door is green with a black colored square placard approximately 2'x 2'; affixed to the middle of the door with "2-C" in white within the middle of this 2' x 2' placard. The door also has a gold handle, peep hole, and gold key cylinder. There is also a green and beige colored mat in front of this door.

**Attachment B-1**

**25 Royal Road**
**Brookline, MA**

A single family residence, English Tudor style home, with a brick exterior and gables on the second level that are yellow in color. The number 25 is affixed on the front door. The front door is wooden, brown in color and has a small window located in the center of the door.

## Attachment C-1

**1 Watson Place**
**Building No. 4**

    This is a two-story commercial building with a brick face. Within the building, number 4 is a storage room that has a gray colored, single door that has no markings on it with a dead bolt above the door  and a gold combination master lock attached to a hasp on this door securing it to the white colored, left side door frame.  When standing in front of this door, there is a set of gray colored double doors to the right with no markings; further to the right of the double doors, around the first corner, is another single, off-white colored door with a dead bolt above the door knob.  Neither the double doors nor the second single off-white door has any markings on it.

## Attachment D1

**The Fairfield Luxury Apartments**
**790 Boylston Street**
**Apt. 17E**
**Boston, MA**

The building is a large, approximately 24 story, multi-unit apartment building, with a red brick and off-white concrete exterior.  Apt. 17E is on the 17th floor; and the entrance to Apt. 17E is located in the common hallway, it has a mustard colored door with a square, gold plate affixed to the door with "17E" on it; this door also has a gold plated kick plate affixed to the bottom of it.

Attachment E-1

**23 Pilgrim Byway**
**Duxbury, MA**

A single-family, ranch style, one-story residence, with natural cedar shingle siding with white trim.  This property has an approximately 7" high privacy stockade type fence surrounding it.  This is a large detached two-car garage and wooden lawn shed on the property.

Attachment G-1

**16 Roach Street**
**Quincy, MA**

A single-family, bungalow-style clapboard home, tan in color with red shutters and a red door. Off the back, there is a blue addition. The front stairs are concrete, with a black railing.

**Attachment F1**

**34 Bolton Street**
**Newton, MA**

    This is a single family, Dutch Colonial home that is tan in
color with green shutters. It has the number 34 affixed to the
left of the front door.

### Attachment A-2

### ITEMS TO BE SEIZED

a.   Paraphernalia used to weigh, package, label, ship,
     and/or distribute any controlled substances,
     including but not limited to scales, baggies,
     bottles used to store prescription medications,
     and any other similar bottles or containers of a
     size that would permit their concealment on the
     human body or their shipment through the mails;

b.   Documents relating to controlled substances
     distribution, including but not limited to
     computer records or print-outs; transaction
     records; ledgers; customer lists; bills; vouchers;
     log books; evidence of financial transactions
     relating to such sales; telephone toll records;
     address and telephone books; photographs; other
     papers reflecting names, addresses and telephone
     numbers; safe deposit keys and records; retained
     shipping records; travel records, to include
     books, records, receipts, notes, ledgers, airline
     tickets, vehicle rental receipts, credit card
     receipts and bills, hotel receipts, meal receipts,
     travel agency vouchers, travel schedules, diaries,
     telephone tolls, money orders, or other travel-
     related papers; keys for self storage facilities;
     books, records, and receipts; state and federal
     income tax returns; bank statements and records;
     money drafts; letters of credit; money orders;
     cashier's checks; passbooks; certificates of
     deposit; documents relating to the acquisition,
     ownership, rental or possession of property,
     including deed records, titles, registrations,
     purchase or sale invoices, escrow account records,
     mortgage receipts, rent or lease receipts, and
     utility billings; and other items evidencing the
     obtaining, secreting, transfer, concealment, or
     expenditure of proceeds acquired through
     controlled substances trafficking; documents
     identifying participants in controlled substances
     trafficking; and any other documents, whether kept
     manually and/or by mechanical and/or electronic
     devices, evidencing the production, purchase
     and/or sale of controlled substances;

c.   Documents relating to the laundering of proceeds
     from the distribution of controlled substances,

including but not limited to bank records,
including account statements, money drafts,
letters of credit, money orders, cashier's checks,
passbooks, and certificates of deposit; retained
records relating to money transfers; documents
relating to the acquisition and transfer or
control of property; tax returns and records
relating to Kurt WALTER; and any other documents,
whether kept manually, mechanically or
electronically, evidencing the proceeds and/or the
disposition of monies generated by the purchase,
manufacture, transportation, and subsequent sale
of controlled substances, as well as the monies
from the distribution of controlled substances;

d. Proceeds of controlled substances trafficking;
physical evidence of the purchase of assets with
controlled substances proceeds, namely, cash,
financial instruments, precious metals, jewelry,
and other items of value which are proceeds of
drug transactions.

**Attachment B-2**

**ITEMS TO BE SEIZED**

a.  Paraphernalia used to weigh, package, label, ship,
    and/or distribute any controlled substances,
    including but not limited to scales, baggies,
    bottles used to store prescription medications,
    and any other similar bottles or containers of a
    size that would permit their concealment on the
    human body or their shipment through the mails;

b.  Documents relating to controlled substances
    distribution, including but not limited to
    computer records or print-outs; transaction
    records; ledgers; customer lists; bills; vouchers;
    log books; evidence of financial transactions
    relating to such sales; telephone toll records;
    address and telephone books; photographs; other
    papers reflecting names, addresses and telephone
    numbers; safe deposit keys and records; retained
    shipping records; travel records, to include
    books, records, receipts, notes, ledgers, airline
    tickets, vehicle rental receipts, credit card
    receipts and bills, hotel receipts, meal receipts,
    travel agency vouchers, travel schedules, diaries,
    telephone tolls, money orders, or other travel-
    related papers; keys for self storage facilities;
    books, records, and receipts; state and federal
    income tax returns; bank statements and records;
    money drafts; letters of credit; money orders;
    cashier's checks; passbooks; certificates of
    deposit; documents relating to the acquisition,
    ownership, rental or possession of property,
    including deed records, titles, registrations,
    purchase or sale invoices, escrow account records,
    mortgage receipts, rent or lease receipts, and
    utility billings; and other items evidencing the
    obtaining, secreting, transfer, concealment, or
    expenditure of proceeds acquired through
    controlled substances trafficking; documents
    identifying participants in controlled substances
    trafficking; and any other documents, whether kept
    manually and/or by mechanical and/or electronic
    devices, evidencing the production, purchase
    and/or sale of controlled substances;

c.  Documents relating to the laundering of proceeds
    from the distribution of controlled substances,

including but not limited to bank records,
including account statements, money drafts,
letters of credit, money orders, cashier's checks,
passbooks, and certificates of deposit; retained
records relating to money transfers; documents
relating to the acquisition and transfer or
control of property; tax returns and records
relating to Douglas BANNERMAN, Kurt WALTER (a/k/a
"Cort"), Gary NEWELL, Daniel MACAULEY, JOHN
MCCARTHY, JOHN GRAHAM (a/k/a "JG" or "G-Man"),
Scott MYERS, and Jose VEZGA; and any other
documents, whether kept manually, mechanically or
electronically, evidencing the proceeds and/or the
disposition of monies generated by the purchase,
manufacture, transportation, and subsequent sale
of controlled substances, as well as the monies
from the distribution of controlled substances;

d. Proceeds of controlled substances trafficking;
physical evidence of the purchase of assets with
controlled substances proceeds, namely, cash,
financial instruments, precious metals, jewelry,
and other items of value which are proceeds of
drug transactions; and

e. firearms.

**Attachment C-2**

**ITEMS TO BE SEIZED**

a.    Paraphernalia used to weigh, package, label, ship, and/or distribute any controlled substances, including but not limited to scales, baggies, bottles used to store prescription medications, and any other similar bottles or containers of a size that would permit their concealment on the human body or their shipment through the mails;

b.    Documents relating to controlled substances distribution, including but not limited to computer records or print-outs; transaction records; ledgers; customer lists; bills; vouchers; log books; evidence of financial transactions relating to such sales; telephone toll records; address and telephone books; photographs; other papers reflecting names, addresses and telephone numbers; safe deposit keys and records; retained shipping records; travel records, to include books, records, receipts, notes, ledgers, airline tickets, vehicle rental receipts, credit card receipts and bills, hotel receipts, meal receipts, travel agency vouchers, travel schedules, diaries, telephone tolls, money orders, or other travel-related papers; keys for self storage facilities; books, records, and receipts; state and federal income tax returns; bank statements and records; money drafts; letters of credit; money orders; cashier's checks; passbooks; certificates of deposit; documents relating to the acquisition, ownership, rental or possession of property, including deed records, titles, registrations, purchase or sale invoices, escrow account records, mortgage receipts, rent or lease receipts, and utility billings; and other items evidencing the obtaining, secreting, transfer, concealment, or expenditure of proceeds acquired through controlled substances trafficking; documents identifying participants in controlled substances trafficking; and any other documents, whether kept manually and/or by mechanical and/or electronic devices, evidencing the production, purchase and/or sale of controlled substances;

c.    Documents relating to the laundering of proceeds from the distribution of controlled substances,

including but not limited to bank records,
including account statements, money drafts,
letters of credit, money orders, cashier's checks,
passbooks, and certificates of deposit; retained
records relating to money transfers; documents
relating to the acquisition and transfer or
control of property; tax returns and records
relating to Kurt WALTER; and any other documents,
whether kept manually, mechanically or
electronically, evidencing the proceeds and/or the
disposition of monies generated by the purchase,
manufacture, transportation, and subsequent sale
of controlled substances, as well as the monies
from the distribution of controlled substances;

d. Proceeds of controlled substances trafficking;
physical evidence of the purchase of assets with
controlled substances proceeds, namely, cash,
financial instruments, precious metals, jewelry,
and other items of value which are proceeds of
drug transactions.

## Attachment D-2

## ITEMS TO BE SEIZED

a.   Paraphernalia used to weigh, package, label, ship,
     and/or distribute any controlled substances,
     including but not limited to scales, baggies,
     bottles used to store prescription medications,
     and any other similar bottles or containers of a
     size that would permit their concealment on the
     human body or their shipment through the mails;

b.   Documents relating to controlled substances
     distribution, including but not limited to
     computer records or print-outs; transaction
     records; ledgers; customer lists; bills; vouchers;
     log books; evidence of financial transactions
     relating to such sales; telephone toll records;
     address and telephone books; photographs; other
     papers reflecting names, addresses and telephone
     numbers; safe deposit keys and records; retained
     shipping records; travel records, to include
     books, records, receipts, notes, ledgers, airline
     tickets, vehicle rental receipts, credit card
     receipts and bills, hotel receipts, meal receipts,
     travel agency vouchers, travel schedules, diaries,
     telephone tolls, money orders, or other travel-
     related papers; keys for self storage facilities;
     books, records, and receipts; state and federal
     income tax returns; bank statements and records;
     money drafts; letters of credit; money orders;
     cashier's checks; passbooks; certificates of
     deposit; documents relating to the acquisition,
     ownership, rental or possession of property,
     including deed records, titles, registrations,
     purchase or sale invoices, escrow account records,
     mortgage receipts, rent or lease receipts, and
     utility billings; and other items evidencing the
     obtaining, secreting, transfer, concealment, or
     expenditure of proceeds acquired through
     controlled substances trafficking; documents
     identifying participants in controlled substances
     trafficking; and any other documents, whether kept
     manually and/or by mechanical and/or electronic
     devices, evidencing the production, purchase
     and/or sale of controlled substances;

c.   Documents relating to the laundering of proceeds
     from the distribution of controlled substances,

including but not limited to bank records,
including account statements, money drafts,
letters of credit, money orders, cashier's checks,
passbooks, and certificates of deposit; retained
records relating to money transfers; documents
relating to the acquisition and transfer or
control of property; tax returns and records
relating to Douglas BANNERMAN, Kurt WALTER (a/k/a
"Cort"), Gary NEWELL, Daniel MACAULEY, JOHN
MCCARTHY, JOHN GRAHAM (a/k/a "JG" or "G-Man"),
Scott MYERS, and Jose VEZGA; and any other
documents, whether kept manually, mechanically or
electronically, evidencing the proceeds and/or the
disposition of monies generated by the purchase,
manufacture, transportation, and subsequent sale
of controlled substances, as well as the monies
from the distribution of controlled substances;

d. Proceeds of controlled substances trafficking;
   physical evidence of the purchase of assets with
   controlled substances proceeds, namely, cash,
   financial instruments, precious metals, jewelry,
   and other items of value which are proceeds of
   drug transactions.

## Attachment E-2

## ITEMS TO BE SEIZED

1.  Documentary or other evidence manifesting dominion and control over the subject premises including, but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, keys, and identification cards;

2.  U.S. currency;

3.  Evidence of proceeds of drug sales and their concealment and/or expenditure, and records of drug trafficking;

4.  Baggies, packaging materials and other drug paraphernalia;

5.  Any cellular telephones (including any cellular telephones with Nextel telephone features); and

6.  Books, records, notes, ledgers, photographs, and any other papers or records relating to the purchase, sale, and/or distribution of controlled substances, including those reflecting the identity of co-conspirators and drug customers, their addresses, telephone, and pager numbers. Such documents include, but are not limited to, telephone address books, planners, receipts, notes, ledgers, telephone bills and/or toll records.

## Attachment F-2

## EXHIBIT B

## ITEMS TO BE SEIZED

1.    Any documents which refer to Douglas BANNERMAN.

### Attachment G-2

### ITEMS TO BE SEIZED

a.    Paraphernalia used to weigh, package, label, ship,
      and/or distribute any controlled substances,
      including but not limited to scales, baggies,
      bottles used to store prescription medications,
      and any other similar bottles or containers of a
      size that would permit their concealment on the
      human body or their shipment through the mails;

b.    Documents relating to controlled substances
      distribution, including but not limited to
      computer records or print-outs; transaction
      records; ledgers; customer lists; bills; vouchers;
      log books; evidence of financial transactions
      relating to such sales; telephone toll records;
      address and telephone books; photographs; other
      papers reflecting names, addresses and telephone
      numbers; safe deposit keys and records; retained
      shipping records; travel records, to include
      books, records, receipts, notes, ledgers, airline
      tickets, vehicle rental receipts, credit card
      receipts and bills, hotel receipts, meal receipts,
      travel agency vouchers, travel schedules, diaries,
      telephone tolls, money orders, or other travel-
      related papers; keys for self storage facilities;
      books, records, and receipts; state and federal
      income tax returns; bank statements and records;
      money drafts; letters of credit; money orders;
      cashier's checks; passbooks; certificates of
      deposit; documents relating to the acquisition,
      ownership, rental or possession of property,
      including deed records, titles, registrations,
      purchase or sale invoices, escrow account records,
      mortgage receipts, rent or lease receipts, and
      utility billings; and other items evidencing the
      obtaining, secreting, transfer, concealment, or
      expenditure of proceeds acquired through
      controlled substances trafficking; documents
      identifying participants in controlled substances
      trafficking; and any other documents, whether kept
      manually and/or by mechanical and/or electronic
      devices, evidencing the production, purchase
      and/or sale of controlled substances;

c.    Documents relating to the laundering of proceeds
      from the distribution of controlled substances,

including but not limited to bank records, including account statements, money drafts, letters of credit, money orders, cashier's checks, passbooks, and certificates of deposit; retained records relating to money transfers; documents relating to the acquisition and transfer or control of property; tax returns and records relating to Daniel MACAULEY; and any other documents, whether kept manually, mechanically or electronically, evidencing the proceeds and/or the disposition of monies generated by the purchase, manufacture, transportation, and subsequent sale of controlled substances, as well as the monies from the distribution of controlled substances;

d. Proceeds of controlled substances trafficking; physical evidence of the purchase of assets with controlled substances proceeds, namely, cash, financial instruments, precious metals, jewelry, and other items of value which are proceeds of drug transactions.