UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>    v. )<br>)<br>3. GARY NEWELL, )<br>)<br>        Defendant. ) | No. 03-10370-DPW |

**GOVERNMENT'S CONSOLIDATED OPPOSITION TO GARY NEWELL'S MOTIONS
TO DISMISS THE INDICTMENT AND FOR A FRANKS HEARING**

The United States of America, by its attorneys, United States Attorney Michael J. Sullivan, and Assistant U. S. Attorney Rachel E. Hershfang, hereby opposes Gary Newell's ("Newell") motions to dismiss the indictment (docket no. 171) and for a Franks hearing (docket no. 166).[1] Because these motions revolve around the same set of facts, they are treated together in this single response.

Newell claims that he is entitled to two remedies: first, that the government's failure to provide requested discovery entitles him to dismissal of the charges against him; and second, that he is entitled to a Franks hearing on a state search warrant that issued in January, 2003, authorizing the search of his truck and its contents. As described more fully below, Newell's allegations fall far short of the required showings for either

---

[1] The motion for a Franks hearing also includes, at pp. 5-9, arguments in favor of suppression. These are addressed in the government's opposition to Newell's motion to suppress, filed herewith.

1

dismissal or a Franks hearing, and the motions should be denied without hearing.

## I.   Facts, Charges.

Gary Newell ("Newell") is one of nine defendants charged in a marijuana conspiracy. As more fully described in the government's opposition to Newell's motion to suppress, filed herewith, Newell was found when DEA followed up on telephone calls to a voicemail box believed to be used by co-defendant Douglas Bannerman ("Bannerman"). Having pieced together information from those calls, from hotel records, and from Newell's own phone records, DEA agents showed up in the morning of January 24, 2003 to do surveillance at a Holiday Inn Express in Cambridge.

This surveillance and the subsequent stop of Newell are fully described in the government's opposition to Newell's motion to suppress, at pp. 1-10, which is incorporated herein by reference. These facts are outlined here only to the extent relevant to the particular issues raised in Newell's motions to dismiss and for a Franks hearing.

Following the initial stop of Newell's truck, and a sniff-search by Mako, a State Police drug-detection dog, Detective Stephen Edwards of the Cambridge Police department[2] sought a

---

[2] Detective Edwards was, at the time, both a Cambridge Police officer and a Task Force Agent working with the DEA group investigating Bannerman and others.

state search warrant for Newell's truck and two Federal Express boxes in that truck.  In the affidavit in support of the warrant, Detective Edwards reported information learned from Massachusetts State Police Trooper Mark Reid, Mako's handler, about his and Mako's qualifications.  Specifically, Detective Edwards declared that Mako and Trooper Reid had been working together since 1996, when they completed a certification program under the auspices of the Connecticut State Police.  Affidavit of Detective Stephen Edwards in Support of Search Warrant ("Edwards Aff.") at 3, ¶1 (attached at Tab 4 to suppression opposition).  Mako was certified, after completing that program, by the New England State Police Administrators' Conference ("NESPAC").  Id.  Since being placed in service, Mako had, at the time of the search, participated in over 1800 searches, including both actual searches and training exercises.  Edwards Aff. at 3, ¶1.  Over 350 times, Mako had identified the odor of narcotics.  Id.  As a result of Mako's work, officers had seized heroin, cocaine, and marijuana.  Id.  Detective Edwards also reported that Mako had alerted to narcotics odor, finding currency, over 30 times.  Id.

   The warrant was signed by a Clerk Magistrate of the Cambridge district court, and the boxes and truck were searched. A search of the boxes yielded approximately $218,910 in cash. See  DEA-6 report dated 1-31-03, entitled, "Surveillance of Gary NEWELL and Seizure of $221,091.00 USC (Exs N-51) on 1-24-03.

Acquisition of Exs. 7, N-48, N-49, N50, N-51, N-52, N-54, N-55, N-56, & N-57" ("Surv. Rep.") ¶31 (attached at Tab 3 to suppression opposition). An additional sum of currency was found in a tan duffel bag in the truck. Id. Five days later, this money was taken from the DEA safe to the Federal Reserve Bank, where it was converted to a check, payable to the U.S. Marshals Service. Surv. Rep. ¶4 (custody of evidence section).

It is DEA's practice to convert seized, forfeitable cash to a cashier's check promptly following the seizure. Affidavit of Special Agent Brian Tomasetta ("Tomasetta Aff.") (attached hereto) ¶5. This practice serves many purposes: first, it ensures that seized cash is promptly given to the U.S. Marshals Service. Second, the practice minimizes the chances that the cash will be lost or stolen pending trial.

## ARGUMENT

### I. Newell Has Made No Showing Sufficient to Warrant Dismissal of the Indictment.

A defendant seeking to dismiss allegations based on the alleged destruction of evidence bears a heavy burden. He must prove: (1) the government acted in bad faith when it destroyed the evidence, (2) the evidence possessed an apparent exculpatory value before it was destroyed, and (3) the missing evidence is, to some extent, irreplaceable. Arizona v. Youngblood, 488 U.S.

51, 58 (1988); California v. Trombetta, 467 U.S. 479, 488-489 (1984); United States v. Femia, 9 F.3d 990, 993-94 (1st Cir. 1993).

Here, Newell claims that, by converting the cash seized from him into a check, rather than by preserving it for testing, and by failing to maintain training records for Mako, the government deliberately destroyed exculpatory evidence, warranting dismissal of the indictment.[3] In making a spoilation claim, the defendant's first burden is to show that the government destroyed evidence in bad faith. Femia, 9 F.3d 990 at 994 n.8 (noting that the burden on defendant to show bad faith is great). There

---

[3] Newell's argument conflates two fundamentally different types of evidence. The currency, he argues, should have been tested by the government and preserved for defense testing. See Mot. Dism., passim. And, Newell claims, the failure to preserve the training records for Mako, the narcotics canine, also deprived him of necessary evidence. Only one of these two items (the currency) is arguably "evidence," and arguably subject to the Youngblood analysis, given a proper showing by the defendant. The dog's training records, while perhaps relevant to a (properly supported) motion for a Franks hearing (see infra., part II), or a suppression motion, cannot be considered "evidence," or even "potentially useful evidence" in connection with the trial. See Youngblood, 488 U.S. at 58. The most Newell can argue with respect to these records is that the government negligently failed to ensure that a non-federal law enforcement agency, the Massachusetts State Police, preserved evidence that might eventually be relevant to a challenge Newell might make to a sworn affidavit. This is simply insufficient to give rise to a motion to dismiss. See, e.g., Youngblood 488 U.S. at 58 (finding that mere negligence on the government's part in failing to preserve evidence is inadequate to show bad faith); United States v. Henderson, 2002 WL 1628495 (4th Cir. 2002) (fact that federal government had nothing to do with destruction precluded Youngblood motion).

is no evidence here that DEA acted in bad faith by following its ordinary practices and converting seized cash into a cashier's check, nor by failing to ensure that the State Police maintained the training records for the police canine whose sniff is at issue.  Indeed, Newell admits as much, asking the Court to take a leap of faith (or lack of faith) with him: "Since these failures were the work of experienced law enforcement agents without any apparent justification, the defendant maintains that they are the product of bad faith."  Defendant Gary Newell's Motion to Dismiss ("Mot. Dism.") at 6.  This claim is facially insufficient to require the analysis Newell seeks.  Cf. Youngblood, 488 U.S. at 58 ("unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law").  See also Femia, 9 F.3d at 994 (in rejecting claim that inadvertent destruction of tapes required dismissal, court noted that, "in missing evidence cases, the presence or absence of good or bad faith by the government will be  dispositive."); United States v. Corpus, 882 F.2d 546, 551 (1st Cir. 1990)(government's destruction of seized narcotics did not violate defendant's due process rights where no showing that government acted in bad faith); United States v. Gibson, 963 F.2d 708, 711 (5th Cir. 1992)("The destruction of evidence alone does not constitute a due process violation; the defendant must show bad faith on the

6

part of the government officials.").

The failure to test the currency for drug residue, likewise, cannot be said to have been done in bad faith. Newell has adduced no evidence that this failure was in contravention of DEA' regular practices; indeed, the evidence is to the contrary. See Tomasetta Aff. ¶5. Indeed, whatever evidentiary value might have inhered in the test results has been lost to defense and prosecution alike. Cf., Youngblood, 488 U.S. at 59 (noting state's incentive to preserve and test potentially inculpatory evidence) (Stevens, J., concurring). Under those circumstances, the conversion of money to a check cannot be said to have been done in bad faith. The analysis need go no further, as Newell has failed at the threshold by not showing bad faith.

Proceeding to the next two prongs of the analysis would do Newell no better. Newell has also failed to establish any basis for dismissal because neither the dog's training records nor the cash was "clearly exculpatory." The remaining evidence with respect to the dog's training, described above, shows that he was certified leading up to the sniff of Newell's truck. It also shows that the dog was initially certified in 1996, and that he had participated in over eighteen hundred narcotics searches, finding narcotics over three hundred and fifty times. See Edwards Aff. at 3, ¶1. Under these circumstances, there is no basis for claiming that the training records were exculpatory.

This failure also requires that the motion to dismiss be denied.[4]
E.g., United States v. Booth 309 F.3d 566, 574 (9th Cir.
2002)("prosecution's duty to preserve evidence applies only to
material evidence, that is, evidence whose exculpatory value was
apparent before its destruction"); United States v. Bloomgren,
2002 WL 1316504 (10th Cir. 2002) (denying motion based on
destruction of evidence where defendant offered only speculation
as to exculpatory value); DiBenedetto v. Hall, 272 F.3d 1, 12-13
(1st Cir. 2001) (evidence must have exculpatory value).

With respect to the cash, as well, Newell falls far short of
the required showing.  Destruction of, or failure to preserve,
evidence, rises to the level of a constitutional violation only
when its "exculpatory value is 'apparent'" and when it is so
apparent "*before* the evidence was destroyed." Youngblood, 488
U.S. at 56, N.*, citing and quoting, Trombetta, 467 U.S. at 489.
Although DEA had no constitutional duty to test the cash, see
Younglood, 488 U.S. at 459, a timely test of the cash for
narcotics residue would likely have been inculpatory, given
Mako's response to the boxes concealing it.  Even had such a test
been timely conducted, and bee negative, it would have provided

---

[4] The absence of an exculpatory value also eliminates any
basis for a finding of bad faith.  See Youngblood 488 U.S. at 51
("the presence or absence of bad faith by the police for purposes
of the Due Process Clause must necessarily turn on the police's
knowledge of the exculpatory value of the evidence *at the time it
was lost or destroyed*").

nothing more than a piece of information to use in attacking Mako's reliability, and thus the search warrant. The test would not have made the cash vanish, nor have erased its powerful evidentiary punch. At best, a negative test would have provided Newell with an argument that the money was marginally less closely linked to drug trafficking. Under the circumstances it cannot be said that the exculpatory value of the cash was apparent before it was converted into a check.

Courts also consider a defendant's opportunity to challenge the government's evidence when determining if a defendant's due process rights have been violated. E.g., Trombetta, 467 U.S. at 490 (noting that, although breath sample was not preserved for future testing by defense, defendant had opportunity to challenge reliability of sampling device); United States v. Patrick, 248 F.3d 11, 27 (1st Cir. 2001)(defendant's due process rights were not violated since defendant had opportunity to cross-examine chemist and there was no reason to question chemist's results); Boyd, 961 F.2d 434 at 437 (while defendant's inability to examine a destroyed urine sample was unfortunate, that did not rise to the level of a constitutional violation). Here, as in Trombetta, Newell may still challenge the accuracy of the "device" (in this case, a dog) that indicated the presence of narcotics odor on the cash. Indeed, Newell could have done so at any time following the seizure of the money, even though he had not yet been

9

criminally charged.

In short, Newell fails to make any of the three necessary showings in support of his motion to dismiss the indictment. The motion should be denied.

**II. Newell Fails to Make Either of the Two "Substantial" Showings Required to Merit a Franks Hearing.**

To be entitled to a <u>Franks</u> hearing, Newell has to make a substantial preliminary showing that (1) a statement in the affidavit was knowingly and intentionally false, or made with reckless disregard for the truth, and (2) the falsehood was necessary to the finding of probable cause. "[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." <u>Franks v. Delaware</u>, 438 U.S. 154, 171-172 (1978); <u>see also</u>, <u>United States v. Charles</u>, 213 F.3d 10, 24 (1st Cir. 2000)(citing <u>Franks</u>, 438 U.S. at 171-172). The burden is on Newell:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

Franks, 438 U.S. at 171.

Newell puts forward two, so-called "material misstatements" in support of his motion for a Franks hearing.  First, Newell claims, he did not commit the alleged underlying traffic violation (failure to stop for a red light).  See Defendant Gary Newell's Motion for a Franks Hearing and Motion to Suppress Evidence ("Mot. Franks") at 3.  Second, Newell says, the search warrant affidavit refers to plural past convictions for narcotics offenses, while he has suffered only one such conviction.  See id. at 3-4.

Assuming arguendo that the first contention were true, and that Newell did not commit a traffic violation, (though the government's evidence is to the contrary, see Surv. Rep. ¶10), these alleged misstatements, whether taken jointly or severally, do not rise to the level of a Franks hearing.  First, Newell has made no showing, and certainly not the requisite "substantial preliminary showing," that the affiant, Detective Edwards, "knowingly and intentionally, or with reckless disregard for the truth, [ ] included [false statements] in the warrant affidavit[.]" Franks, 438 U.S. at 155-56; accord United States v. Castillo, 287 F.3d 21, 25 (1st Cir. 2002).  Second, neither statement is critical to the affidavit's establishment of probable cause.  See Franks, 438 U.S. at 155-56; Castillo, 287 F.3d at 25.  Without the challenged statements, "there remains

11

sufficient content in the warrant affidavit to support a finding of probable cause." Franks, 438 U.S. at 171-72.

> **A.  Newell Makes No Showing That Detective Edwards' Inclusion of the Challenged Facts Was Knowing, Intentional, or Made with Reckless Disregard for the Truth.**

The focus of the Franks inquiry is on the state of mind of the affiant. See, e.g., Franks, 438 U.S. at 155-156 (defendant must make a "substantial preliminary showing that a false statement knowingly and intentionally or with reckless disregard for the truth, *was included by the affiant* in the warrant affidavit." (emphasis added)); see also United States v. Manning, 79 F.3d 212, 220, n.1 (1st Cir. 1996). Newell has adduced absolutely no evidence that Detective Edwards knew of the alleged falsity of the information regarding either the traffic violation or the criminal record. Indeed, the report describing the search of the track indicates that Detective Edwards himself saw the traffic violation. Surv. Rep. ¶10 ("TFA's Santos, Edwards and S/A Tomasetta saw the truck pass through a red traffic light without stopping..."). In the face of that evidence, Newell's bald assertion that (1) the claim was false and (2) Detective Edwards knew it to be false, must be rejected.

Newell has also failed to show that Detective Edwards had any knowledge that, rather than past convictions for narcotics offenses, Newell had been convicted only once. As reflected in

the surveillance report of that day, it was not Detective Edwards (admittedly in plainclothes, see Affidavit of Gary Newell in support of Motion to Suppress) ("Newell Aff." at ¶¶5-8) who ran the record.  Compare Surv. Rep. ¶14 ("the marked unit conducted a criminal check on NEWELL and learned he has an adult record dating back to 1977.")  Detective Edwards did not run the record check; given that all parties involved were sitting by the side of the road, it is likely that the marked unit called into the Cambridge Police and received the results orally.  Whatever miscommunication -- or misrepresentation, to take Newell's view -- occurred, there has been no showing that it was Detective Edwards' doing, nor that he was even aware of it.

Newell's failure to meet the first of Franks' two required showings is fatal to his claim.  The motion should be denied.

> **B. Newell Fails to Show that Either the Allegedly False Statement as to the Traffic Violation or the Misstatement as to the Number of His Narcotics Convictions was Necessary to the Finding of Probable Cause.**

The second requisite showing for a Franks hearing is that the alleged falsehood was necessary to the finding of probable cause.  To answer this question, a court sets aside the disputed material and determines whether, without it, "there remains sufficient content in the warrant affidavit to support a finding of probable cause"; if so, "no hearing is required." Franks v. Delaware, 438 U.S. 154, 171-172 (1978).

In this case, Newell states in a conclusory fashion that, "[h]ad Mr. Newell's criminal record been detailed accurately in the affidavit, his convictions likely would have [been] considered too insignificant and remote in time to support probable cause for the search of his truck in 2004." Mot. <u>Franks</u> at 4. This conclusion misunderstands the test. The question is not whether the disputed material, standing alone, sufficiently establishes probable cause for the search, but whether the affidavit, <u>absent</u> the disputed material, still establishes probable cause.

This it does. In assessing whether or not probable cause is established, an issuing court looks at the "totality of the circumstances" in the supporting affidavit to determine whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983). The facts "need only 'warrant a man of reasonable caution' to believe that evidence of a crime will be found. [citation omitted] The probable cause standard 'does not demand showing that such a belief be correct or more likely true than false.'" <u>United States v. Feliz</u>, 182 F.3d 82, 86 (1st Cir. 1999), cert. denied 528 U.S. 1119 (2000) (<u>quoting</u> <u>Texas v. Brown</u>, 460 U.S. 730, 742 (1983)).

In light of the totality of the circumstances set forth in Detective Edwards' affidavit, even absent the challenged

14

information, there would still have been probable cause for the search warrant to issue.

Detective Edwards' affidavit established that Newell was pulled over by a marked Cambridge Police cruiser. Edwards Aff. p.1, ¶3. Following that stop, Detective Edwards looked into the bed of the pickup truck, in which Newell had apparently traveled from Oregon, and saw no suitcases or clothing consistent with Newell's travel to New England in January. Id. p.1, ¶3. Detective Edwards then interviewed Newell, who identified his hotel (Holiday Inn Express) but said he had checked out. Id. p. 1, ¶4. Moments later, Newell said that he nonetheless had to go back to his hotel room, despite already having paid the bill. Id. at 1-2. When asked about his trip, Newell said he was going skiing in the White Mountains -- consistent with the skis in his truck, but not with the lack of any apparent cold-weather clothing. Detective Edwards, a 17-year veteran of the Cambridge Police, characterized Newell as "nervous," particularly when Detective Edwards looked at the rear of the truck bed. Id. at 2, ¶2. Detective Edwards then confronted Newell with his suspicions, focusing on the Federal Express packages specifically, and the truck, generally. Id. at 2, ¶4. Newell then authorized Detective Edwards to search all but the Federal Express packages. Id. This request by Detective Edward was made twice, and twice denied. Id at 2, ¶¶4-5.

15

The drug dog (Mako) and his handler (Trooper Mark Reid) were called, and the affidavit sets out their years of experience together (1996-2004), as well as the Mako's initial certification, in 1996, in the detection of narcotics odor, following over 250 hours' worth of training.  Id. at 3, ¶1. Detective Edwards detailed Mako's continuous certification since 1996, as well as his participation with Trooper Reid in weekly training sessions.  Detective Edwards reproduced Trooper Reid's records with respect to Mako's total number of narcotics searches (over 1800), his detection of narcotics on over 350 occasions, and his positive reaction on more than 30 occasions to narcotics odor, resulting in the recovery of money.  Id.

Detective Edwards then described Mako's initial search of the truck, noting that it was a windy day, and noting that Trooper Reid smelled "a strong odor of oranges."  Id. at 3, ¶2. After focusing on the wind, Detective Edwards wrote, Trooper Reid moved items from the rear of the bed (in the wind) to where they were sheltered from the wind.  Id.  At that time, the dog went into the truck again, and began scratching and biting the FedEx boxes -- Mako's trained response for the presence of narcotics odor.  Id.

Through a hole torn in the box by the dog's tooth, officers saw money.  Id.  Although Detective Edwards did not describe the money's packaging, beyond its presence in a FedEx box, he stated

16

that the packaging was consistent, in his experience, with drug-dealers' transportation of their proceeds.  Id. at 3-4.

Taken without the disputed information, Detective Edwards' affidavit is still sufficient to establish probable cause for the search.  It reflects the stop and questioning of a person who gave inconsistent answers and appeared nervous, who was from elsewhere and claimed to be traveling for recreational purposes, but lacked necessary accoutrements for that travel.  The affidavit also reveals a man who consented to search of all of his truck, with one, strongly held, objection: no search of the Federal Express boxes.  Although Newell was exercising his constitutional rights by withholding consent to search the boxes, the officers were not required to turn a blind eye to this decision-making and its likely implications.  Finally, the affidavit reveals the response of a highly trained working dog, a response consistent with that he is trained to give in the presence of a narcotics odor.  That information, taken together, establishes probable cause for a search of the truck and the boxes.  Furthermore, the dog's response provided a window into the package's suspicious contents, the nature of which was also set forth in the affidavit.

In short, Detective Edwards' affidavit stands up to scrutiny, even absent the contested information.  The motion for a Franks hearing should be denied.

**III. Conclusion.**

For the reasons set forth above, and any adduced at argument or hearing, if required by the Court (the government submits that neither is necessary), the motions to dismiss and for a <u>Franks</u> hearing should be denied.

Respectfully submitted,<br>
MICHAEL J. SULLIVAN<br>
United States Attorney

By:  <u>/s/ Rachel E. Hershfang</u>
     RACHEL E. HERSHFANG
     Assistant U.S. Attorney

Dated: December 28, 2004